Marlys SCHAACK, Plaintiff
and Appellee,

v.

Paul SCHAACK, Defendant
and Appellant.

No. 15555.

Supreme Court of South Dakota.

Nov. 4, 1987.

Arthur M. Hopper, Austin, Hinderaker, Hackett & Hopper, Watertown, for plaintiff and appellee.

Roger W. Ellyson, Ellyson Law Offices, Watertown, for defendant and appellant.

WUEST, Chief Justice.

Paul M. Schaak (husband) appeals from a judgment and decree of separate maintenance dismissing with prejudice his counterclaim for divorce. We affirm.

Husband is 73 years old. He is hard of hearing and has a severe case of epilepsy which causes seizures and blackouts. He is described as a slow thinker and communicator, but a man who knows what he is talking about. Through pension and retirement programs his income is approximately $1,091 per month.

Marlys Schaak (wife) is 48 years old. In twelve years at the Redfield State Hospital she completed the fifth grade. She earns approximately $31 per week babysitting.

The parties were married in 1971. They lived in a home husband completed building after the marriage. Throughout the marriage the couple borrowed money to pay such expenses as taxes, expenses from automobile accidents, and doctor bills.

In January 1981, on the advice of doctors, husband began living in a nursing home where his medication for epilepsy could be carefully monitored and controlled. Wife visited him in the nursing home every other Sunday until he told her not to return. She does not drive so her ex-husband drove her to the nursing home twice. She testified that husband always visited with her and was not upset during the visits. She did swear at him, though, when he called her at midnight to have her come and release him from the nursing home. She denied that her visits were motivated by a need for money. She did obtain a court order, however, that enabled her to receive $214 per month of his funds.

The nursing home administrator handled husband's finances during the four years that he lived in the home. He testified that wife infrequently visited husband during the week. He knew that some of the visits were for money since he wrote the checks. Although he did not see what upset husband, the administrator did see husband leave the home upset "a couple of times" while wife was still visiting. He was also aware that husband's seizure activity increased when he was upset after visits, but he could not remember whether the visits were from wife.

In December 1984, husband returned home for an overnight visit. When he left the house in the evening husband told wife that he would be back, but he did not return. Instead he began living with an elderly woman. Both he and this woman had a paid caretaker who testified that she once overheard a telephone conversation where wife swore at husband, threatened to rip up two of his checks and sell his house. Wife denied such a conversation, but admitted swearing at him when he refused to come back to live with her or to give her some money.

Wife sold the home in April 1985. She testified that she told husband that she would not sell it if he would come back and live with her. When she sold the home wife testified that on the advice of her attorney she signed the deed as a single person. She used all but $13 of the $11,900 proceeds from the sale to pay the parties' outstanding debts.

After wife sold the house she lived with her ex-husband for fifteen months. She testified that she did so because she had no other place to go. They did not have a sexual relationship and she worked to pay for her food. By the time of the court trial, though, she was living with a daughter.

Wife brought suit seeking a decree of separate maintenance and a reasonable amount of money for support. Husband counterclaimed for a divorce on the grounds of extreme mental cruelty and irreconcilable differences. The trial court concluded that wife was entitled to a decree of separate maintenance on the grounds of extreme cruelty and willful desertion. The court found that wife's actions toward husband did not constitute

extreme cruelty and dismissed his counter-claim. Husband contends that the trial court erred in not granting him an absolute divorce on the grounds of extreme cruelty.

■ Extreme cruelty is defined as "the infliction of grievous bodily injury or grievous mental suffering upon the other, by one party to the marriage." SDCL 25–4–4, 25–4–2. In a marital setting, the definition of extreme cruelty differs according to the personalities of the parties involved. *Brandsma v. Brandsma*, 318 N.W.2d 318 (S.D.1982).

> What might be acceptable and even commonplace in the relationship between rather stolid individuals could well be extraordinary and highly unacceptable in the lives of more sensitive or high-strung husbands and wives. Family traditions, ethnic and religious backgrounds, local customs and standards and other cultural differences all come into play when trying to determine what should fall within the parameters of a workable marital relationship and what will not.

*Pochop v. Pochop*, 89 S.D. 466, 467–68, 233 N.W.2d 806, 807 (1975). "We must view the evidence in light of the full context of the marriage and not in light of isolated incidents." *Rykhus v. Rykhus*, 319 N.W.2d 167 (S.D.1982). Consequently, the factual conditions that this court has reviewed to determine whether extreme cruelty existed in a marital setting have been widely varied. *Compare Pochop, supra; Palmer v. Palmer*, 281 N.W.2d 263 (S.D. 1979); *Rhykus, supra; Gassman v. Gassman*, 296 N.W.2d 518 (S.D.1980).

In addition, in *Pochop, supra,* we outlined the framework for appellate review of cases where extreme cruelty is at issue:

> An appeals court is in a position quite removed from the personalities and the setting of the marriage under attack and must necessarily rely on the judgment of the trial judge who has the benefit of hearing and seeing the principal parties, the children, the neighbors and other witnesses and who knows [sic] the local standards far better usually than can the members of this court. We have recently again said that:

> "In cases tried to the court without a jury, findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity the trial court had to judge the credibility of the witnesses." *Masek v. Masek*, 1975, 89 S.D. 62, 228 N.W.2d 334.

89 S.D. at 467–68, 233 N.W.2d at 807.

■ In this case we defer to the judgment of the trial court for two reasons. First, husband had great difficulty in testifying and, from our review of the cold record, limited ability to answer the questions asked. Therefore, the trial court allowed wide latitude in questioning husband and the trial court's assessment of credibility and demeanor takes on greater importance. *See Pochop, supra.*

The second reason why we defer to the trial court in this case is that virtually all of the trial testimony was controverted. Husband testified below and now argues that four basic facts support a finding of extreme cruelty: Wife lived with another man while being married to husband; wife sold all of his property without his knowledge or consent; all contacts with wife in the past five years resulted in arguments which increased his seizure activity; and, wife's only interest in husband is for his money.

Wife, however, disputed these claims or the circumstances surrounding them. Husband, she claimed, gave away part of his property prior to entering the nursing home. She was forced to sell their home after husband began living with the other woman, refused to live with wife, and their joint debts needed payment. Husband's refusal to return to her coupled with her limited earning capacity forced the living arrangements with her ex-husband. She disputed husband's claim that all their contact resulted in arguments and testified that she would willingly live with husband if he would return.

Where findings of the trial court are based on conflicting testimony, as they are in this case, we will not disturb them on appeal. *Matter of Estate of Joseph*, 304 N.W.2d 419 (S.D.1981). Therefore, having

thoroughly reviewed the record in light of our prior holdings on the topic, we cannot say that the trial court was clearly erroneous in finding that wife's actions did not constitute extreme cruelty. *Pochop, supra.*

The judgment is affirmed.

MORGAN, SABERS and MILLER, JJ., concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

Defendant-appellant (Paul) is entitled to meaningful review from this Court. This case is a miscarriage of justice, in my opinion, and I cannot join the majority opinion nor bless the decision of the trial court.

First of all, the trial court's findings and conclusions basing a decree of separate maintenance are bottomed on extreme cruelty and willful desertion. Plaintiff-appellee wife never pleaded willful desertion. She was not before the court on willful desertion. No issue was framed on willful desertion upon which the trial court could predicate a holding for a decree of separate maintenance on the grounds of willful desertion.[1] On that ground alone, the judgment should be reversed.

As for granting a divorce against Paul, under the state of this record, it appears to be unfounded in fact; rather, the record suggests that Paul is entitled to a divorce on the grounds of extreme cruelty. There is testimony by Paul to establish that wife used profanity against Paul (she admitted this under oath, Trial Transcript, at 78) and it is corroborated by other testimony in the record; wife placed Paul in the nursing home and then took up residency with her ex-husband.[2] *Yet*, incredibly, she then maintains that Paul deserted her. Having placed her ill, elderly husband for four years in the nursing home circa 1979 against his will, wife proceeded to sell his tools, his home, and his vehicle. Trial Transcript, at 21, reveals questioning of Paul through adverse examination:

Q: —why else? What other reasons do you have for asking the Court for this divorce?

A: Why would I have—I haven't got a place to live.

Q: Now, that's one of the reasons—

A: You got no place to live, and it's sold and sold all my tools, where in the hell am I going to be?

Wife also was able to manipulate his benefits so that she received a monthly stipend. In short, wife financially stripped him, after she put him into a nursing home. A washer and dryer, at the time of trial, were in her ex-husband's home. Wife falsely asserted on a warranty deed, dated April 1985, that she was a single person.[3] Wife made no accounting to Paul of the proceeds from the sale of the house (sold for over $11,000) nor, for that matter, the tools or pickup. When wife moved into the home of her ex-husband, Paul became terribly upset, which adversely affected his mind and his health, Paul being an epileptic. This caused him to have further seizures and blackouts.

Wife's few visits to the nursing home triggered angry conduct towards Paul, to include shredding two of his checks to which she obtained possession, and then shrieking and damning him for his existence. Paul had to leave the nursing home, on divers occasions, to avoid his wife creating scenes at the nursing home.[4] On sever-

1. Plaintiff admitted, under oath, during these proceedings that she would not live with Paul as she could not care for him and that he was too stubborn. Because of his health problems, she literally deserted him.

2. This record reveals that she lived with this man for at least one year during her marriage to Paul; she testified that she had to. This ex-husband gave her a ride so she could see Paul at the nursing home; she "made his meals and stuff" and "washed his clothes...." Trial Transcript, at 81.

3. Settled record, at 39, reflects the deed dated April 9, 1985, signed by Marlys M. Schaack, "a single person," deeding two lots in Watertown, South Dakota, to Delaine M. and Lillian M. Owen; this is a lie, a fraud, and a thievery of Paul's homestead interest.

4. Her visits were spawned by electrical/plumbing/mechanical breakdowns at the house accompanied by requests for money. On holidays and his birthday, she paid him no heed.

al occasions, he went to his house and found it filthy. On one occasion, the refrigerator contained a great amount of beer. He protested against filth and alcohol in his home. He testified before the trial judge that he never drank alcohol and that he did not want it around him or in his home. Therefore, Paul did not buy the beer nor drink the beer in the refrigerator. Presumably, the beer was for the recreational pursuits of his wife and her ex-husband. This alcohol in his home emotionally upwrought him, as he seems to have a total aversion to its use and consumption. Independent testimony in the record substantiates the shrieking, screaming, and swearing by the wife at Paul.[5] In fact, one Clara Carr heard the filthy names heaped upon Paul by his wife and additionally testified that she heard his wife state that she was going to "tear these two checks up and sell [his] home." There is no suggestion, whatsoever, that his wife showed him any affection or interest. These parties, apparently, had not cohabited for approximately five years. It is obvious that there is one reason, and one reason only, that the wife opposed Paul's divorce, and that was to avoid losing any widower's benefits from the Veteran's Administration and to continue to squeeze, from Paul, any further monies by way of guile that she could obtain, as a result of still being married to Paul. She does not want Paul. He obviously, in asking for the divorce, no longer wanted her as his wife.

The majority opinion's characterization of Paul "living with an elderly woman" partakes of an innuendo which is unsavory and unjustified. Paul and a crippled, elderly woman shared a house rather than to live in a nursing home; it is an innocent situation and both contribute to a full-time paid caretaker. This caretaker testified as to the financial arrangement. This humble housing situation, with two elderly people, grasping for independence and on limited income, would make a good scenario for a John Steinbeck novel. It is not a Harlequin romance, with hearts and flowers. To use

this situation as grounds for divorce against Paul, so far as this author is concerned, is the last straw. It is grasping for a grounds for divorce that simply does not exist. This old gentleman, stricken with epilepsy, and now homeless because his wife had sold his home, was creative enough to find a caretaker who would look over him in the twilight of his life and it is now painted bad. I paint it good.

One of the reasons he wanted a divorce was her drinking of intoxicants. He complained that she and her ex-husband's brother were "drunk." Trial Transcript, at 25. She admits that she drinks intoxicants. Trial Transcript, at 77. When she did drink intoxicants, she went "uptown," she testified. To deny Paul a divorce herein, under these facts, is a blatant miscarriage of justice and results from this Court's failure to give a meaningful review of this case. This Court should set aside the findings of fact in this case, as they are clearly erroneous: "A finding is clearly erroneous when upon reviewing the entire evidence, we are left with a definite and firm conviction that the trial court has erred." *In re Estate of Gosmire,* 331 N.W.2d 562, 567 (S.D.1983). Thus, the conclusions of law are not supported by the findings of fact. Paul's wife inflicted grievous mental suffering upon him by the acts depicted above and further inflicted grievous bodily injury by exacerbating the conditions of his epilepsy. *See* SDCL §§ 25–4–4, 25–4–2. The *Pochop* citation in the majority opinion is nothing more than inapposite, legal oatmeal which is warmed over to try to give the trial court's decision some sustenance. This woman's conduct is not "acceptable" and "even commonplace in the relationship between rather stolid individuals ... [f]amily traditions, ethnic and religious backgrounds," not to mention "local customs and standards and other cultural differences" which would justify the inhumane treatment of Paul and the thievery of his personal property and home. *Pochop,* 89 S.D. at 467, 233 N.W.2d at 807. Reading this record, I am con-

---

5. Per testimony of Joseph Ward, Nursing Home Administrator, Paul suffered seizures after his wife's visits. She was verbally abusive to the administrator and used profane language against him, by his testimony.

vinced that this is the most unjust decision that I have seen in the annals of domestic relations law in this state.

Under the decree of separate maintenance, wife does receive from Paul the sum of $250 per month—$100 payable directly from the Veteran's Administration, and $150 directly from Paul in increments of $75 bimonthly. Paul is, according to the findings of fact and conclusions of law, a very ill man, not to mention being quite aged.

Quite recently, I wrote a special concurrence in *In re Guardianship of Viereck,* 411 N.W.2d 102, 107 (S.D.1987). In said writing, I cited cases in the United States Supreme Court concerning the definition of "clearly erroneous," and I further cited cases involving "conclusions of law" in the United States Supreme Court. We are not bound by the clearly erroneous standard on the conclusions of law. The question is whether or not they are a "mistake of law" or "mistake in impression of legal principles" or a "conclusion[ ] of law ... in error as a matter of law." *Id.* at 108. The conclusions of the trial judge here fit into any one of these three categories, all of which amount to the same concept. Mistakes of law were committed by the trial court below. The conclusions of law are not justified by the facts; they are "mistake[s] of law" and "mistake[s] in impression of legal principles" or rife "in error as a matter of law"; the findings of fact are clearly erroneous per SDCL 15–6–52(a), for Paul was treated with extreme cruelty through the infliction of grievous physical and mental suffering. *In re Estate of Ho-*

*belsberger,* 85 S.D. 282, 181 N.W.2d 455 (1970).

I began this dissent by expressing that the appellant is entitled to meaningful review. Trial courts do make mistakes and that is why, *inter alia,* we have appellate courts. For a dissertation on the functions, generally, of our appellate courts, *see* the dissents of Henderson, J., in *State v. Honomichl,* 410 N.W.2d 544, 550 (S.D.1987), and *State v. Weddell,* 410 N.W.2d 553, 557 (S.D.1987). At the appellate level, we seek to instill a dignity and acceptability of the trial process and to regulate trial courts to the extent of promoting some degree of uniformity among decisions.

May trial courts make decisions based upon economics? Paul proved up grounds for divorce, yet, it was denied. His wife proved up a need for money, so she was granted a decree of separate maintenance to fulfill a legal vehicle to supply her need. Stripped of his worldly assets, Paul now takes on the role of a lifetime meal ticket for a wife who has treated him with disdain and scorn. Judicial review safeguards the liberty of litigants under our form of government. Here, it has broken down and the law, unfortunately, has not protected the weak—Paul Schaack; rather, it has inflicted injustice upon him.