**Peggy Lea BROOKS, Plaintiff and Appellee,**

v.

**Dale G. BROOKS, Defendant and Appellant.**

No. 17058.

Supreme Court of South Dakota.

Considered on Briefs Jan. 10, 1991.

Decided May 22, 1991.

---

828

John D. Knight, Watertown, for plaintiff and appellee.

Thomas M. Tobin, Aberdeen, for defendant and appellant.

WUEST, Justice.

Dale G. Brooks (Dale) appeals a decree of divorce. We affirm.

## FACTS

Peggy Lea Brooks (Peggy) met Dale in 1972. When they began dating Peggy was a high school graduate and was working in a department store. Peggy did not go to college or receive any post-high school training or education during the seven years they dated. She was working as a secretary when they married on September 22, 1979. Peggy had to undergo surgery before the couple was able to have children. They eventually had two children; Brittany (August 1986) and Tyler (October 1987). Peggy missed six weeks of work for the birth of Brittany and ten months of work for Tyler. When Peggy quit her job for the birth of Tyler, she was earning $5.20 per hour.

Dale has been employed for twenty years at Brooks Motors, a family owned business. He is service manager and currently earns $7.00 per hour. He works about 55 to 60 hours per week for which he is compensated on the straight hourly rate. He typically earns a bonus ranging from $3000 in 1987 to $500 in 1988. Dale has accumulated 378 shares of stock in Brooks Motors corporation which are valued at not less

than $70,124.75. Additionally, Brooks Motors owes long term debt to its shareholders, including $20,959.23 which is owed to Dale. Dale is in the position to ultimately acquire an additional seven to ten and one-half percent of the outstanding shares of Brooks Motors. Dale receives health insurance coverage for himself and his dependants and is provided the use of several automobiles. Dale's reported gross wages in 1988 were $20,640.75 and in 1989 were $24,108.98. Thus, *Dale's gross income in 1989 was approximately $2009 per month.*

Peggy currently works as a legal secretary approximately 35 hours a week and earns $4.50 per hour. *Peggy's gross income is thus approximately $630 per month.* She receives no additional employee benefits. Free health insurance is provided to Peggy and the children under Dale's policy at Brooks Motors. Peggy incurs $225 per month in baby-sitting expenses.

Peggy filed for divorce. Dale and Peggy reached agreement on many of the issues in the divorce, but child support and alimony were taken to trial. The trial court set child support in excess of the guidelines established in SDCL 25–7–6.3 and awarded rehabilitative alimony. The trial court denied Dale's motion for a new trial. Dale appeals and challenges the rehabilitative alimony, child support, and denial of the motion for new trial. Peggy seeks attorney fees for defending this appeal.

## DECISION

WHETHER THE TRIAL JUDGE ABUSED HIS DISCRETION IN AWARDING REHABILITATIVE ALIMONY.

 Peggy was awarded "rehabilitative alimony" in the amount of $200 per month for the period of three years (i.e. $7200). As with ordinary alimony, the decision to award rehabilitative alimony is committed to the sound discretion of the trial court. *Bradeen v. Bradeen,* 430 N.W.2d 87, 88 (S.D.1988). "Because each case is peculiar to its facts, the trial court is not bound to setting such awards with mathematical precision or within certain rigid parameters." *Studt v. Studt,* 443 N.W.2d 639, 643 (S.D.1989).

 In determining whether to award *alimony* the trial court should consider the length of marriage, the respective earning capacity of the parties; their respective financial condition after the property division; their respective age, health and physical condition; their station in life or social standing; and the relative fault in the termination of the marriage. *Bradeen,* 430 N.W.2d at 88.

The marriage lasted approximately 10 years. Dale has a gross income of approximately $2009 per month. Peggy has a gross income of approximately $630 per month. Dale pays child support of $521 per month. Peggy was awarded the couple's marital home subject to an $8000 premarital interest which Dale retained in the property. Peggy was given 16 years to pay Dale his $8000 interest in the house or she could waive rehabilitative alimony in full satisfaction of the $8000. In all, marital property was essentially divided evenly between the parties. Both Dale and Peggy are apparently in good health and physical condition. The trial court did not specify either party was more at fault than the other.

A trial court considering rehabilitative alimony should also consider, "the amount of supporting spouse's contributions, his or her foregone opportunities to enhance or improve professional or vocational skills, and the duration of the marriage following completion of the nonsupporting spouse's professional education." *Wilson v. Wilson,* 434 N.W.2d 742, 745 (S.D.1989) *citing Saint–Pierre v. Saint–Pierre,* 357 N.W.2d 250, 262 (S.D.1984). This Court has stated that "[t]he purpose of rehabilitative alimony is to put the supporting spouse in a position to likewise upgrade their own economic marketability." *Bradeen,* 430 N.W.2d at 88.

As in *Bradeen,* the crux of Dale's argument is that there was no showing the marriage displaced Peggy's acquisition of job skills or occupational status. Peggy had been out of high school for at least seven years before marrying and during

that time she continued working and gaining work experience. Throughout most of the marriage, she was able to maintain her premarital employment except for the ten month period following the birth of Tyler. She now makes less per hour than she did before Tyler's birth. She is entering a new profession and is being trained on the job. She believes she is improving herself and increasing her earning capacity by becoming a legal secretary.

The trial court considered Peggy's recent profession change and awarded the rehabilitative alimony. After reviewing the record and the findings of fact and conclusions of law, we cannot say the trial court abused its discretion in awarding rehabilitative alimony.

WHETHER THE TRIAL JUDGE ABUSED HIS DISCRETION WHEN HE DEVIATED FROM THE STATUTORY GUIDELINES IN SETTING CHILD SUPPORT.

■ This Court will not disturb an award of child support unless it clearly appears the trial court abused its discretion. *Donohue v. Getman*, 432 N.W.2d 281, 282 (S.D.1988). SDCL 25–7–6.10 sets forth the factors which must be considered before a judge can deviate from the child support schedule established by the South Dakota legislature. This Court has held deviation may be made from the guidelines only if specific findings are made to justify the deviation. *Sharp v. Sharp*, 422 N.W.2d 443 (S.D.1988).

The trial court made 20 findings of fact. It determined that Peggy incurs $225.25 baby-sitting charges per month, the parties divided marital property evenly, Peggy has monthly expenses (including children's expenses) of $1300 per month, and Dale has monthly living expenses of less than $600. The trial court also found Dale earns nearly three times as much as Peggy and has a greater earning capacity. The trial court considered all the relevant statutory factors and determined they justified a deviation from the child support schedule. In light of equal division of the marital property and the relative incomes and expenses of the parties, a judicial mind could have

determined a deviation from the guidelines was justified. The trial court did not abuse its discretion in deviating from the guidelines.

WHETHER THE TRIAL JUDGE ABUSED HIS DISCRETION WHEN HE DENIED THE MOTION FOR NEW TRIAL.

■ Dale filed a motion for new trial. Dale supplied the court, for the first time, with W–2 forms showing his precise income in past years and for 1989. The trial court denied the motion for new trial but entered supplemental findings of fact which incorporated the income figures indicated on the W–2 forms.

Dale contends that because the trial court adopted the numbers on the W–2 forms, the court should have granted the new trial. The trial court reviewed the motion for new trial and determined it did not state sufficient grounds to justify a new trial. However, the trial court noted that, for the first time, he had father's exact income figures. The trial court entered supplemental findings to assure these exact income figures were a part of the record rather than continuing to rely on estimates.

The trial court reviewed the financial figures supplied by Dale and determined, although they were accurate, they did not establish sufficient grounds to justify a new trial. We hold the trial court did not abuse its discretion.

### ATTORNEY'S FEES

■ We have reviewed Peggy's request for appellate attorney's fees and have analyzed the request pursuant to the appropriate factors specified in previous decisions of this court. *See, e.g., Studt*, 443 N.W.2d at 644. An order will be entered directing Dale to pay $1000 to Peggy for her defense of this appeal.

MILLER, C.J., and SABERS, J., and HERTZ, Acting J., concur.

HENDERSON, J., dissents.

AMUNDSON, J., not having been a member of the Court at the time this action was submitted did not participate.

HENDERSON, Justice (dissenting).

To establish alimony, based upon gross wages, is wrong; it defies the true net income. It is not economic reality; thus, it inherently skews alimony upwards. Gross wages or gross earnings do not depict the true ability to pay. Need and the ability to pay are the two well established criteria in setting alimony. *Havens v. Henning*, 418 N.W.2d 311 (S.D.1988). For that reason alone, I cannot support the majority's rationale; it sends a bad signal to the trial courts of this state; it creates a false view of the ability to pay.

Furthermore, the trial court's decision to turn over the $8,000.00 equity in the house or pay "rehabilitative" alimony is obviously not "rehabilitative" alimony. It smacks of property award. It is, simply, a twisting of concepts. It is a warping of our previous holdings on rehabilitative alimony. It violates the spirit of the purpose of rehabilitative alimony, to-wit: To enhance her economic marketability. Rehabilitative alimony is designed to enable a spouse to become self-sufficient. *Baltzer v. Baltzer*, 422 N.W.2d 584 (S.D.1988). She is self-sufficient now and refuses to work a 40 hour week. She does not attend any school. She was a legal secretary before the divorce, during the divorce, and intended to continue working as a legal secretary. There was no showing that her skills were outdated. She was out of high school for 10 years before marrying Dale Brooks; not once did she attend college or secure any post high school training after graduation and during the marriage. Only one finding of fact pertained to rehabilitative alimony (# 15); factors to be considered, in awarding rehabilitative alimony, were not considered at all. Example: Her foregone opportunity to enhance or improve her professional or vocational skills. The rehabilita-

tive alimony award was used here to bludgeon the father into paying or lose his equity in the home. It was designed to overcome by judicial aggression.

I would reverse the trial court and remand for findings of fact and conclusions of law to carry out the decisional law of this state. The rehabilitative alimony award cannot be set aside unless there is an abuse of discretion. *Tate v. Tate*, 394 N.W.2d 309 (S.D.1986). Under the terms of the award, there was an abuse of discretion. *Nelson v. Nelson*, 454 N.W.2d 533, 534 (S.D.1990).

There should be a reversal on the child support award, also. The trial court deviated from the child support guidelines (above the guidelines) and totally failed to enter findings of fact and conclusions of law as to *why*. The reasons for the deviation were not articulated. Again, this case should be reversed and remanded to comport with our prior decisions. *Bruning v. Jeffries*, 422 N.W.2d 579, 580 (S.D.1988); *Johnson v. Johnson*, 451 N.W.2d 293 (S.D. 1990). Here, the trial court chose *not* to apply SDCL 25–7–6.10(10) [1] as exemplified by the fact that the plaintiff/mother saw fit to *voluntarily* work only 35 hours per week [2]; defendant/father worked voluntarily 60 hours per week. Here, the trial court considered only one factor in making its deviation; SDCL 25–7–6.10(10) was not applied; neither was SDCL 25–7–6.10(2) applied because father's assiduous efforts in working 60 hours a week was not considered. Insufficient findings were entered on the deviation; we have held that *specific* findings must be made to justify deviation from the guidelines. *Peterson v. Peterson*, 449 N.W.2d 835 (S.D.1989); *Sharp v. Sharp*, 422 N.W.2d 443 (S.D.1988). The 20 findings of fact did not specifically address the 10 factors. The trial court addressed only one of these. Furthermore, *neither litigant requested a deviation*. Trial court acted sua sponte. If the Bar and Bench are to respect our decisions, we

---

**1.** Each parent of a child is obliged to provide support for a child. SDCL 25–7–6.1. Fathers and mothers, in other words, must *both* support their children.

**2.** "Any deviation [from the child support guidelines] must be based on the factors listed in SDCL 25–7–6.10."

must demonstrate consistency in this Court.

Guidelines and deviations are not to be applied mechanistically. Our trial judges are not automatons to do a legislative bidding. This Court's standard of review on child support is: Did the trial court abuse its discretion in setting such award? *State of Kansas, ex rel. John W. Adams v. Donice Adams*, 455 N.W.2d 227 (S.D.1990). The reasonable needs of the child and the obligor's ability to pay has not been eliminated as valid considerations for the trial court's judgment. The 1989 State Legislature, in extensively revising SDCL ch. 25-7, has now provided that deviation from the guidelines may be made for "any financial condition of either parent which would make application of the schedule inapplicable." *See*, 1989 Sess.L. ch. 220 (HB 1081), now SDCL 25-7-6.10. SDCL 25-7-6.9 provides:

> For a combined *net* income above the schedule in § 25-7-6.2, the child support obligation shall be established at an appropriate level, taking into account the actual needs and standard of living of the child. (emphasis supplied mine).

In my opinion, the trial court skewed the child support upwards—beyond the guidelines—and improperly considered his ability to pay same. Finding 4 in the supplemental finding reflects a gross misrepresentation as to the supposed fact that she would have only $366 a month to support herself and the children. Such an assumption is based upon no child support at all and no insurance coverage provided by Dale Brooks. Forcing him to work 60 hours a week to pay rehabilitative alimony and child support is not equity, it is slavery.

Discretion. Abuse of discretion. Equity. Think this over: Must the father work 9½ hours a day and 6 days per week to pay "rehabilitative" alimony and child support? She, in the meantime, voluntarily chooses to work 35 hours a week. Perhaps she is not in a soft sofa eating bon bons and watching "Santa Barbara" or "The Days of Our Lives" on television, but she still has the ability and need to "rehabilitate" herself by working a full week. Work is one of God's greatest gifts to man. She should try it. It will help her character and pocketbook. It will help her fulfill her statutory duty. Under the trial court's scenario, she will have $1,132.00 per month at her disposal (working 35 hours a week); "on the other hand," as Randy Travis sings, he will have $817.00 at his disposal (working 60 hours a week).

Work on. Walk on. For alimony. Work until you're weary. Work until you're old. But work. Tired of livin'; feared of dyin'. But—old man alimony—he just keeps rolling along. Sing the song, brother. Sing the song.

Oh yes, one last little fact: Plaintiff/appellee did not ask for rehabilitative alimony in her complaint! Tsk. Tsk. It was another judicial sua sponte.