John D. OSMAN, Plaintiff and Appellant,

v.

Connie R. KEATING–OSMAN, Defendant and Appellee.

No. 18530.

Supreme Court of South Dakota.

Considered on Briefs May 25, 1994.

Decided Sept. 7, 1994.

Thomas J. Nicholson, Johnson, Eklund, Nicholson, Dougherty & Abourezk, and Barbara Everist, Sioux Falls, for plaintiff and appellant.

Karen L. Crew, Crew & Crew, Sioux Falls, for defendant and appellee.

WUEST, Justice.

John Osman (John) appeals from certain provisions of a decree of divorce from Connie Keating–Osman (Connie). We affirm.

## FACTS

John and Connie were married on January 22, 1993. This was the first marriage for both parties, and no children were born of the marriage. Connie had a minor child (Scott, aged 2) from a previous relationship. On June 22, 1993, John filed a complaint seeking a divorce from Connie on grounds of extreme cruelty. Connie answered and counterclaimed, likewise seeking a divorce on the grounds of extreme mental cruelty. The trial court granted a divorce to Connie on grounds of extreme mental cruelty on October 22, 1993. At the time of the divorce, John was age 34 and Connie was age 37. John raises several issues in his appeal which we address separately. Additional facts are set out where applicable.

## ISSUE I: DID THE TRIAL COURT ABUSE ITS DISCRETION IN GRANTING A DIVORCE TO CONNIE ON GROUNDS OF EXTREME CRUELTY?

John first argues that the trial court erred in not granting a divorce on grounds of irreconcilable differences. However, SDCL 25–4–17.2 provides in pertinent part: "The court may not render a judgment decreeing the legal separation or divorce of the parties on the grounds of irreconcilable differences without the consent of both parties[.]" We note that according to the testimony, John did engage in tactics designed to persuade Connie to agree to a divorce on grounds of irreconcilable differences. When Connie wanted John to go to marriage counseling in an attempt to save the marriage, John stated that he would go to counseling *only* if Connie would agree to a divorce on grounds of irreconcilable differences if the counseling did not help. John also told Connie that he would pay $500 on a car repair bill on the condition that Connie agree to an uncontested divorce. These tactics were unsuccessful. As the parties did not agree to a divorce on the ground of irreconcilable differences, granting a divorce on such grounds was not an option for the trial court.

Both parties sought a divorce on grounds of extreme cruelty. "Extreme cruelty is the infliction of ... grievous mental suffering upon the other, by one party to the marriage." SDCL 25–4–4. "In a marital set-

ting, the definition of extreme cruelty differs according to the personalities of the parties involved." *Schaack v. Schaack*, 414 N.W.2d 818, 820 (S.D.1987) (citing *Brandsma v. Brandsma*, 318 N.W.2d 318, 318 (S.D.1982)). The trial court granted a divorce to Connie on the grounds of extreme mental cruelty. After listening to the testimony of the parties, the court found as a fact that: "[Connie] relied on [John's] marriage promises, and [John] made no attempt to seek counseling or to try and make the marriage work." The court concluded that, "[John] has been guilty of extreme cruelty toward [Connie], by his breach of the marriage contract." Findings of fact are not set aside unless this court finds them to be clearly erroneous; and we must give "due regard" to the opportunity of the trial court "to judge the credibility of the witnesses." *Schaack*, 414 N.W.2d at 820 (citing *Pochop v. Pochop*, 89 S.D. 466, 467–68, 233 N.W.2d 806, 807 (1975)). These findings and conclusions are amply supported by our review of the record.

John and Connie met on August 1, 1992 and started dating shortly thereafter. In September they decided to get married, and in October they decided to live together. John moved into Connie's house on or about November 1. Although John wanted to marry in December, Connie convinced him to wait and they were married on January 22, 1993. The newlyweds went on a honeymoon to the Virgin Islands, and the honeymoon quickly ended.

Beginning the day after the return from the honeymoon, and for the entire duration of this brief marriage, John was either impotent or ejaculated prematurely. The couple never had satisfactory sexual relations after the honeymoon. Connie asked John to discuss this with his doctor during his physical exam, to see if there was any physical problem or some way to resolve the problem. According to Connie, John reported that the doctor said there was no physical cause for his impotency or premature ejaculation, that the problem was "in his head." There is some question as to whether John even discussed his impotency and premature ejaculation problems with the physician, as the medical report states: "[John] feels well and has

no particular concerns or questions today.... Things are apparently going fairly well for him." That medical report is dated April 20, 1993, approximately two months before John filed for divorce.

Related to John's inability to engage in satisfactory intercourse with his wife were implications that John has homosexual tendencies. John brought into evidence his own medical records showing that in March 1991 he had contracted a case of condyloma (genital warts). When asked by his own attorney whether he was aware that genital warts are often present in homosexual males, John admitted that knowledge; but said that he had contracted genital warts from a female partner. John's attorney asked:

Q: Are you saying that there is no connection between your sexual problems right after the honeymoon and for the duration of the marriage with Connie and any other sexual practice that you might have?

A: I don't believe I have homosexual tendencies.

. . . . .

Q: And do you consider yourself heterosexual?

A: Yes.

The physician's notes state in part that, "I admonished [John] to consider how he got these and take appropriate steps to protect himself and his partners."

Another bizarre problem that John developed rather abruptly at the end of the honeymoon was incessant and inappropriate passing of gas. John admitted that he had this problem, but insisted that it was beyond his control, stating, "I don't think I ever intentionally passed gas in front of people. Gas hits me. It hits me quick. If I can step away I do." Connie testified that John never had this problem before they were married; or that if he did, he must have controlled it because she was unaware of it. Connie also testified that he did it "almost like a controlled thing that he could do ... sort of like a retaliation thing." John could control it for a couple of days, and then if he got upset, it would start again. Connie asked him to please be considerate and use the bathroom

for that purpose. But John refused and would pass gas at the dinner table, while watching television, or anywhere in the house he felt like it. If Connie expressed displeasure regarding this situation, John felt that he was being belittled.

Approximately six weeks after the marriage (early March 1993), John suddenly moved out of the house without prior warning or explanation. He returned after about a week, only to move out again on or about May 20 (approximately ten weeks later), according to John's testimony. John testified that he wanted the marriage to work.

According to Connie's testimony, John "insisted that Scotty call him daddy from the time he moved into the house and Scotty has been asking for daddy every since. He always wants to know when daddy is coming home." John stated very strongly that he intended to adopt Scott. When John left, it was distressing to Connie when Scott would ask when "daddy" was coming home.

John's reason for leaving Connie was that she "constantly verbally abused" him, and complained that Connie spoke to him in a "very sharp fashion." John gave two examples, one regarding Connie's displeasure with his passing gas. The other example was in regard to Connie's request that he put a used steel wool pad (for scrubbing dishes) into a plastic cup to avoid rust stains, rather than leaving it on the kitchen counter. John could not recall whether this incident actually took place before or after the marriage. There was no testimony of any physical abuse or that voices were ever raised.

After hearing the testimony, the trial court reacted by stating to John:

I think you could have worked this marriage out[.] Moving out after six weeks to me because of what you say, yelling—I've been married twenty-four years and if I would have moved out every time my wife yelled at me, I would have been divorced about five hundred times. I don't think you tried to make this work.... Like I said, I'm not so much worried about this passing gas or anything like that but I think this marrying, living together for six weeks, walking out, coming back and walking out again and not trying to work it out,

to me that's cruelty. I so find and I conclude.

Based on our review of the record, we cannot find that the trial court was clearly erroneous when it granted a divorce to Connie on the grounds of extreme mental cruelty. The trial judge is in the best position to see and hear the evidence and view the personalities of the parties. *Schaack,* 414 N.W.2d at 820. The trial court was clearly convinced that the fault for the failure of this marriage lay with John. The trial court is affirmed on this issue.

**ISSUE II:** **DID THE TRIAL COURT ABUSE ITS DISCRETION IN MAKING ITS DIVISION OF MARITAL PROPERTY AND DEBT?**

In making the property division, the court ordered Connie to return a number of listed items of personal property to John. In particular, there were a number of wedding gifts that John wanted. The other major consideration with regard to marital property division was the division of debt. The court concluded:

[John] shall pay the debt to Citibank Mastercard in the amount of $5,559.57[,] $215.00 [of] which was [Connie's] debt before the parties' relationship, for a total of $5,344.57; and one-half of the debt to Central Plains Clinic in the amount of $115.76[.] [Connie] shall pay the debt to Andrea's Photo Design in the amount of $519.05; and one-half of the debt to Central Plains Clinic in the amount of $115.76[.]

Connie had also testified that she was a devout Roman Catholic, and requested the court to order John to pay $650 to the Catholic Diocese so she could obtain an ecclesiastical annulment of the marriage so that she could receive the rites of the Catholic church. While the court expressed sympathy for the request, the judge stated since he had never seen that kind of award in a decision, he could not grant the request. Thus, John was assigned $5,460.33 of debt, while Connie was assigned $634.81 of debt, plus the cost of the annulment ($650).

This court has consistently recognized the principal factors to be considered in making an equitable property division as: (1) the duration of the marriage; (2) the value of the property; (3) the age of the parties; (4) the health of the parties; (5) the parties' competency to earn a living; (6) the contribution of each party to the accumulation of the property; and (7) the income-producing capacity of the parties' assets.

*Vander Pol v. Vander Pol*, 484 N.W.2d 522, 524 (S.D.1992) (citing *Kanta v. Kanta*, 479 N.W.2d 505, 508 (S.D.1991); *Ryken v. Ryken*, 461 N.W.2d 122, 126 (S.D.1990); *Baltzer v. Baltzer*, 422 N.W.2d 584, 587 (S.D.1988)). "'A trial court has broad discretion with respect to property division and we will not set aside its judgment unless a clear abuse of discretion is shown.'" *Schwab v. Schwab*, 505 N.W.2d 752, 755 (S.D.1993) (quoting *Studt v. Studt*, 443 N.W.2d 639, 642 (S.D. 1989)). "'The term "abuse of discretion" refers to a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence.'" *Vander Pol*, 484 N.W.2d at 524 (quoting *Kanta*, 479 N.W.2d at 507 (citations omitted)).

█ Since the trial court's findings of fact and conclusions of law clearly demonstrate that consideration was given to each factor, "it is unnecessary to reiterate each of them here." *Kappenmann v. Kappenmann*, 479 N.W.2d 520, 524 (S.D.1992). The court took particular note that John has a college education and is working on a master's degree and is employed as a civil engineer with an income of at least $40,000 annually, thus he is capable of earning a substantial income. Connie has a high school diploma and works at Citibank, earning about $12,000 annually. Upon John's urging, Connie quit working the night shift where she earned a night shift differential and began working the day shift at a lower rate of pay.[1] She cannot immediately switch back to the night shift until there is an opening. At the beginning of the relationship (October 1992), Connie had a balance on her Citibank charge card of $215.77. By the time of the marriage (January 1993) the balance had ballooned to $4044.42—the bulk of which appeared to be wedding and honeymoon expenses. Although John had $35,000 in savings, plus approximately $28,000 in pension plans, he encouraged Connie to put these wedding-related expenses[2] on her charge card because she had a lower rate of interest as a Citibank employee. The trial court found as a fact that the "credit card debt of the parties would not be as high as it is had it not been for the marriage and [John's] insistence that all property be kept as separate as possible. [John] should have been taking on some of the expenses of the parties from the beginning of the relationship." The court stated from the bench that, "I know [John] wanted his wedding presents and he got

1. The court noted that Connie also cleaned houses to supplement her income prior to her marriage to John, but stated that income would not be considered in the property division or alimony award. The record shows that Connie testified that at one time she had a business called "Buy Some Time" and she performed "errands and party planning and house cleaning and things that older people or professional people don't have time to do." When she became pregnant she closed the business and canceled her tax i.d. license. However, Connie testified that people for whom she had cleaned would call and ask her to clean house for them, and she did. Connie was able to do this during the day because she worked the night shift (3:30 p.m. until midnight) at Citibank. Connie testified that she made about $400 additional income per month thereby. This income went unreported on her income tax return. After the start of the relationship, John said she did not need to clean houses any more, and asked her to transfer to the Citibank day shift. Fearful that John would turn her (as well as the customers) into the I.R.S., Connie refused to supply the names and addresses of the women for whom she cleaned house. Judge Srstka stated: "I'm not going to consider any of this house cleaning business[.] If you are going to clean houses, you are going to earn income and ... you ought to follow the law and report it to the government."

2. In an affidavit, John itemized the fact that he bought a $3,100 wedding ring for Connie, and paid another $600 for other wedding expenses such as music, singers, use of the church and a limousine. We find that these items are gifts and have no bearing on the property division or alimony award. It is a sad commentary that John offers the price of a wedding ring as evidence of property contribution; and that the bill for the wedding pictures is part of the debt distribution in a divorce decree. As the trial judge stated, "I guess I can't think of anything to have less utility than wedding pictures of a failed marriage[.]"

those. I think he ought to take responsibility for the debts, too, because the debts would not have been incurred without the marriage[.]" Other contributions and expenses, such as some electrical and landscaping work on the house were done at John's suggestion and direction. It is unlikely that Connie would have spent those monies on her own, with her limited income.[3] Conversely, John makes more than three times as much money as Connie, and has no dependents.

Based on our review of the record, we cannot find that the court abused its discretion on the division of property and liabilities. We affirm the trial court on this issue.

## ISSUE III: DID THE TRIAL COURT ABUSE ITS DISCRETION IN AWARDING FIFTEEN MONTHS OF ALIMONY TO CONNIE AT $450 A MONTH?

 The court awarded Connie alimony of $450 a month for fifteen months. Pending the divorce, the court had previously awarded Connie temporary alimony of $600 per month, which John paid for three months for a total of $1,800. John was given credit for amounts already paid, so the result was that the actual alimony payment is $330 a month for fifteen months. John appeals this award of alimony.

> The amount and length of alimony payments is ... left to the discretion of the trial court. This court will not disturb an award of alimony unless it clearly appears that the trial court abused its discretion. In awarding alimony, the trial court must consider the following factors: the length of the marriage, the respective earning capacity of the parties; their respective financial condition after the property division; their respective age, health and physical condition; their station in life or social standing; and the relative fault in the termination of the marriage.

*Schwab v. Schwab,* 505 N.W.2d 752, 754 (S.D. 1993) (citing *Studt v. Studt,* 443 N.W.2d 639, 643 (S.D.1989)). *See Vander Pol v. Vander*

*Pol,* 484 N.W.2d 522, 525 (S.D.1992); *Kanta v. Kanta,* 479 N.W.2d 505, 511 (S.D.1991). The clear abuse of discretion standard that we apply to property divisions also applies to our review of alimony awards. *Vander Pol,* 484 N.W.2d at 524 (citations omitted).

The trial court stated that in making the alimony award, note was taken of the fault of the parties as well as the factors previously set out by this court. At the conclusion of the trial, the court stated that Connie had changed her position in reliance on the marriage promise and "she is in a worse position now than she was before she got married.... I give great weight to the lifestyle and the income disparity and the position before and after the marriage." In its findings, the trial court stated that Connie's "standard of living has deteriorated since the separation." The court also found that "[John's] fault, income disparity, differing lifestyles, capacity to earn a living, and financial condition of the parties, justifies an award of alimony to [Connie]."

Based on our review of the record, we cannot find that the court abused its discretion in the award of fifteen months' alimony to Connie. We affirm the trial court on this issue.

## ISSUE IV: ATTORNEY FEES

 John urges that the court abused its discretion in awarding attorney fees to Connie of $869.20. Connie's total bill to the time of trial was approximately $1,700, so the amount awarded was approximately one-half of her attorney's fees, taxes and costs.

> "SDCL 15–17–7 gives the trial court discretion to award attorney fees in divorce cases, and we will not disturb its decision unless it has abused its discretion. The factors the court may consider in deciding whether to award attorney fees include the relative financial condition of the parties, the relative fault of the parties in prolonging litigation, the complexity of the issues, whether briefs were required and whether

---

3. It is commendable that Connie was doing as well as she was on her limited income. She had purchased a small home in Sioux Falls valued at around $40,000 with a mortgage payment of $318 per month to provide a home for herself and her son. She had managed to put away $4,000 in an IRA (from which she had to withdraw $1,000, with penalties, to pay her attorney) and purchase some U.S. savings bonds for her son's college education. Many single parents are unable to budget so well, especially on such a limited income.

the case was appealed to the Supreme Court."

*Schwab,* 505 N.W.2d at 756 (quoting *Radigan v. Radigan,* 465 N.W.2d 483, 487 (S.D.1991) (citations omitted)). At the end of trial, the trial judge—who sees many divorce cases—stated:

> I think this case should have been settled. And I think [John] came in with a wholly unrealistic attitude about not having to pay anything. So I think that should be taken into consideration and I take it into consideration. The idea that you can enter into a marriage and then have a person change position in her life and walk out and not expect to pay anything is not realistic in the law.

Our review of the record reveals no abuse of discretion in the trial court's award of attorney fees, and we affirm the trial court on this issue.

Connie filed a separate motion for appellate attorney fees accompanied by an itemized statement of expenses. *Radigan,* 465 N.W.2d at 487 (citing *Malcolm v. Malcolm,* 365 N.W.2d 863, 866 (S.D.1985)). "The factors used to determine whether one party should be required to pay attorney fees for the other party in a divorce appeal include 'the property owned by each party, their relative incomes, the liquidity of the assets, and whether either party unreasonably increased the time spent on the case.'" *Caughron v. Caughron,* 418 N.W.2d 791, 794 (S.D.1988) (quoting *Storm v. Storm,* 400 N.W.2d 457, 458 (S.D.1987)). We are presented with a statement of $2,321.40. John has significantly more liquid assets and income than Connie; and our review of this record convinces us that he unreasonably increased the time spent on this case. We award Connie one-half of the entire amount of her appellate attorney fees herein.

MILLER, C.J., and SABERS, J., concur.

HENDERSON and AMUNDSON, JJ., concur in part and dissent in part.

HENDERSON, Justice (concurring in part and dissenting in part).

Basically, I concur with the property division award and dissent to the alimony award in the amount of $415.00 per month.

Furthermore, it is my opinion that footnote 3 contains editorial comment which is not in keeping with either facts or applicable law used to decide this case. It is obvious that the first and last sentences thereof are intended to laud the industrious, thrifty nature of wife. Then, the majority opinion portrays a scenario, with two sentences linked to footnote 3, that she is relatively poor and he is relatively rich. Hence, the leap of induction is to implement a modern day Robin Hood theory: Take it from the rich and give it to the poor.

The alimony award is apparently based upon, *inter alia,* John's refusal to control the passing of gas. As gas passing is a body function of ordinary human beings, it should not be so severely punished by a monthly alimony or rehabilitative alimony award. Consider that this marriage was of a short duration. In point of fact, it appears that it lasted approximately five months. Moreover, there were absences within that time window.

Apparently the trial court also based its opinion upon an improper criteria, namely that "the defendant is a single mother and the plaintiff has no other ties. I think that should be taken into consideration." Five months earlier, the same social condition existed, i.e., she was a single mother before the marriage. Thus, it appears that such a situation "cannot be laid at [John's] door." *Ryken v. Ryken,* 440 N.W.2d 300, 303 (S.D.1989). However, it was.

There appears to be no evidence of Connie ever having been unable to enhance her working skills during this short marriage nor did she forego any opportunities of improvement. She is self-sufficient. *See Johnson v. Johnson,* 471 N.W.2d 156, 163 (S.D.1991); *Baltzer v. Baltzer,* 422 N.W.2d 584 (S.D. 1988). The trial court failed, and thus erred, to consider the very short duration of the marriage. *Vander Pol v. Vander Pol,* 484 N.W.2d 522, 525 (S.D.1992).

In my opinion, the facts simply do not warrant rehabilitative alimony. *Brooks v. Brooks,* 470 N.W.2d 827, 829 (S.D.1991).

From the beginning, this appears to have been a marriage which was doomed. Both parties shared in their apparent ill-conceived contract; therefore, both parties should equally share in its failure. Not all of the fault should be directed towards John. An award of rehabilitative alimony or alimony, per se, is not, on this record, supportable. It is clearly against reason and evidence and there is an abuse of discretion. *Straub v. Straub*, 381 N.W.2d 260, 261 (S.D.1986); *Herndon v. Herndon*, 305 N.W.2d 917 (S.D. 1981).

The dissertation, in the majority opinion, on "genital warts" is a needless infliction of emotional pain upon John. These parties cohabited from on or about November 1, 1992, and then married on January 22, 1993. She had to have known of any genital warts before she went on a honeymoon and subsequent thereto. Furthermore, another factual assumption, without any foundation of fact in the record, is that there "were implications that John has homosexual tendencies." According to the text of the majority opinion, there is not one fact to establish this and there is nothing in the Findings of Fact by the trial judge to base such a statement upon. An intuition is not a fact.

Gas passing by John for retaliation, says Connie. Intentional, says Connie. "A controlled thing," she says. Such testimony, and the majority opinion's reliance thereon, caused me to browse a collegiate book by Gideon E. Nelson of the University of South Florida, *Biological Principles with Human Perspectives,* 3–11 (John Wiley & Sons, Inc. 1980). Noted at page 7 is a dissertation on how new biological knowledge is attained. Thereat, it is expressed that scientists, by research efforts, particularly in areas of special interest to them, make a significant contribution by challenging an existing theory. "The crucial beginning step is to design significant questions for the investigation to answer." These questions are, according to this treatise, stated in the form of a "hypothesis." It is assumed, by this writer, that the intentional, retaliation theory, used as legal rationale herein by the majority opinion, is in the form of a biological hypothesis. "Hypothesis, that is, an unproven conclusion that challenges or extends an older conclusion and thus provides a basis for further investigation and experimentation." Before us, there is no professional testimony or data to support Connie's statement. This statement apparently conveys that John can withhold gas and expel it, when he decides to do so, to purposely annoy Connie. Her hypothesis that he can control his gas and emit it, at his whim, to retaliate against her, without "further investigation and experimentation" is highly questionable.

Here is my editorial comment: It appears the price of gas is going up in Sioux Falls.

I am authorized to state that Justice AMUNDSON joins this special writing.