1996 SD 2

**Kevin Mark JONES, Plaintiff and Appellee,**

v.

**Dawn R. JONES, Defendant and Appellant.**

No. 18861.

Supreme Court of South Dakota.

Argued April 25, 1995.

Decided Jan. 10, 1996.

Dana J. Frohling of Spiry and Frohling, Britton, for plaintiff and appellee.

R. Greg Bartron of Bartron, Wiles, Rylance and Holgerson, Watertown, for defendant and appellant.

JOHNS, Circuit Judge.

[¶ 1] Dawn R. Jones (Dawn) appeals from a decree of divorce awarding custody of the parties' three minor children to Kevin Mark Jones (Kevin). Dawn also appeals the amount of rehabilitative alimony awarded. We affirm.

### FACTS

[¶ 2] Dawn and Kevin Jones were married on March 11, 1989 in Britton, South Dakota. Kevin was thirty years old at time of trial and is an enrolled member of the Sisseton–Wahpeton Dakota Nation. He was adopted at age seven by Maurice and Dorothy Jones. Dawn was twenty-five years old at time of trial and is Caucasian. The parties have three children, Lyndra, Elias and Desiree. Lyndra was born to Dawn prior to her marriage to Kevin.[1] She was subsequently adopted by Kevin.

[¶ 3] During the marriage, the parties resided in a trailer house on the farm of Kev-

---

1. Lyndra's natural father is also of Native American descent.

in's parents. Kevin is a minority shareholder in and works for Penrhos Farms. Penrhos is a close family farm corporation, owned primarily by Kevin's father and his three uncles. The Joneses are an extremely close-knit and supportive family. In fact, Kevin often takes the children to work with him, as this is a family tradition. However, farm safety is very important and is stressed by all members of the family.

[¶ 4] Kevin works predominantly in construction and in the feeding of the cattle on the Penrhos Farms. His net earnings for child support purposes are approximately $1,880.00 a month. During the marriage, Dawn was a homemaker for a time and also held various jobs. She is currently enrolled in a nursing program at the Sisseton–Wahpeton Community College.

[¶ 5] Kevin is a recovering alcoholic who, while drinking, exhibited a behavior of violence towards Dawn and a somewhat casual indifference to the children. He has been sober since December 1992 and regularly attends and presents Alcoholics Anonymous meetings.[2] Dawn suffers from depression and low self-esteem but is seeking counseling at this time.

[¶ 6] Deterioration of the marriage is attributed to Kevin's alcoholism, Dawn's depression, financial problems and a lack of communication. Both parties were granted a divorce based upon mental cruelty. They were also granted joint legal custody of the children with primary physical custody being awarded to Kevin.[3] The court awarded Dawn rehabilitative alimony to allow her to finish the nursing program. She was awarded the cost of two years tuition, $10,680.00, with a monthly payment of $445.00, to commence when she returns to school.

## ISSUES

[¶ 7] Three main errors have been asserted by Dawn in this appeal: first, whether the trial court abused its discretion in awarding custody of the children to Kevin; second, whether the trial court wrongfully considered race when determining the best interests of the children; and third, whether the trial court abused its discretion with the award of rehabilitative alimony.

## ANALYSIS

### I.

[¶ 8] Dawn contends that the trial court erred in finding as a matter of fact that Kevin is a fit person to have care, custody and control of his children. She also contends that even if the trial court did not err in finding that Kevin is fit to parent the children, the trial court abused its discretion when it chose Kevin over herself as the parent who would have primary physical custody of the children.

The paramount consideration for the trial court in deciding the issue of child custody is the temporal, mental and moral welfare of the child. *Peterson v. Peterson*, 449 NW2d 835, 837 (SD 1989); *Lindley v. Lindley*, 401 NW2d 732, 733 (SD 1987). [Now codified in SDCL 25–4–45]. The trial court exercises broad discretion in awarding custody and its discretion will be reversed only upon a clear showing of an abuse of that discretion. *Jones v. Jones*, 423 NW2d 517, 519 (SD 1988); *Anderson v. Anderson*, 472 NW2d 519, 520 (SD 1991). In determining whether there has been an abuse of discretion, this court does not decide whether it would have made the same ruling, but must determine if a judicial mind could have made a similar decision in view of the law and that particular case's circumstances. *Johnson v. Johnson*, 468 NW2d 648 (SD 1991).

*Voelker v. Voelker*, 520 N.W.2d 903, 905–6 (S.D.1994).

In reviewing the trial court's custody decree, the trial court's findings of fact will not be set aside unless clearly erroneous and due regard will be given to the trial court's ability to judge the credibility of the witnesses.

---

2. The trial court stressed the importance of Kevin remaining alcohol-free in its decision to award him custody.

3. The trial court granted Kevin primary physical custody of the children during the pendency of the action after hearing the testimony of the parties.

*Matter of Guardianship of Janke,* 500 N.W.2d 207, 211 (S.D.1993), (citing *Anderson,* 472 N.W.2d at 520); SDCL 15–6–52(a).

[¶ 9] Dawn contends that because Kevin sometimes verbally and physically abused her when he was drinking, he is not a fit person to have charge of the care and education of his children. The trial court's finding that Kevin is fit is based, in part, on a home study completed by Mr. Thomas L. Price, a licensed psychologist. His home study included clinical interviews with the parties, meetings with the children, and his observations of the parents and children together at the respective homes of the parties and his office. Mr. Price also administered to both parties the Minnesota Multiphasic Personality Inventory, the Millon Clinical Multiphasic Inventory–II, The Custody Quotient, the Child Access to Parental Strength Questionnaire, and the Access to Adult Strength: Parental Self–Report Data. After considering the effect of Kevin's alcoholism and domestic violence on his parental capacity, Mr. Price rendered the following conclusions and recommendations:

> Both Kevin and Dawn Jones were found to demonstrate adequate parental capacities. Dawn Jones obtained a higher score on the Custody Quotient. [Kevin obtained a CQ score of 112 which is in the High Average Parent Classification Range. Dawn obtained a CQ score of 120 which is at the low end of the Superior Parent Classification Range.] Her personality test findings were less suggestive of psychological difficulties and Lyndra's rating on the BPS [Bricklin Perceptual Scales: Child Perception of Parent] tended to favor her mother. Parent-child interactions and home visitations failed to reveal significant difference between the parents.
>
> The preponderance of information gathered by this examiner favors Dawn Jones as the custodial parent. The court is encouraged to afford liberal visitation rights to Kevin Jones, however.

[¶ 10] Based on the home study of Mr. Price along with his testimony and all of the other evidence in the record, we are unable to say that the trial court's finding of Kevin's fitness is clearly erroneous. Thus, we affirm the trial court on this issue.

[¶ 11] Contrary to the recommendations of Mr. Price and his associate, Ms. Judi Muessigmann, a clinical social worker, that primary custody of the children be placed with Dawn, the trial court determined that it should go to Kevin. In its findings of fact and conclusions of law, the court relied heavily upon the stability and continuity that Kevin could provide through his relationship with the Jones family. Specifically, the court stated in finding of fact number 52 that "the children have always known Penrhos Farms as their home, and granting primary physical custody to Father will allow the children to remain on the farm, and give them access to the numerous family support systems of the large and close Jones family." The trial court also stressed that, while Dawn may well be the preferable custodial parent at the immediate time, he was of the opinion that Kevin was the preferable parent over the "long haul." In doing so, he recognized our holding in *Jasper v. Jasper,* 351 N.W.2d 114 (S.D.1984) that stability is a very desirable factor in child rearing.

[¶ 12] The trial court made its custody decision after hearing the testimony of the parties at the interim custody hearing and after nearly three days of trial testimony. It is apparent that the trial court wrestled long and hard with its decision as evidenced by the 20–page memorandum opinion, 15 pages of which dealt with the custody issue. After reviewing the testimony, along with the trial court's findings of fact and conclusions of law, we cannot say that its decision to award Kevin primary custody was an abuse of discretion. We affirm the trial court on this issue.

## II.

[¶ 13] Dawn argues that the trial court awarded the children to Kevin for the principal reason that, as a Native American, he has suffered prejudice and will therefore be able to better deal with the needs of the children when they are discriminated against because, although they are biracial, they have Native American features. She contends that the trial court impermissibly con-

sidered the matter of race when determining the custody of the children and thereby violated her right to equal protection of the laws as found in Section One of the Fourteenth Amendment to the United States Constitution.

[¶ 14] In support of her arguments, Dawn cites to the decision of the United States Supreme Court in *Palmore v. Sidoti*, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984). In *Palmore*, the mother and father were both Caucasian. They divorced and the mother was awarded custody of their minor daughter. The mother subsequently lived with and then married a Negro man which prompted the father to sue for change of custody. The trial court changed custody solely and expressly because the child was likely to experience discrimination if she remained in a biracial household. The Supreme Court reversed. In doing so it recognized that, while the child may well experience prejudice because she lived in a biracial home and that her best interests might be served by a change of custody, "[t]he effects of racial prejudice, however real, cannot justify a racial classification removing an infant child from the custody of its natural mother found to be an appropriate person to have such custody." 466 U.S. at 434, 104 S.Ct. at 1882–1883, 80 L.Ed.2d at 426. The rationale for this holding was that although the constitution cannot control racial and other ethnic prejudices, "neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Id.*, 466 U.S. at 433, 104 S.Ct. at 1882, 80 L.Ed.2d at 426.

[¶ 15] Albeit the trial court did not cite to *Palmore* in either its memorandum opinion (which was incorporated into its findings and conclusions) or in the findings of fact and conclusions of law, the court was apparently aware of its holding and scrupulously honored it. The trial court wrote in the memorandum opinion:

> Plaintiff addressed the issue of racial discrimination and Native American culture in his testimony. He states that all three children would be discriminated against as Native Americans if they left Penrhos

farm to live. He wants for them the same loving, non-discriminatory upbringing that he received as a child at Penrhos. Plaintiff also wants to continue to make the children aware of their culture and heritage and participate in Tribal functions. *[Mississippi Band of Choctaw Indians v.] Holyfield, supra* [490 US 30 at 33 n. 1], 109 SCt [1597] at 1600 n. 1 [104 LEd2d 29 (1989)], *Tubwon v. Weisberg*, 394 NW2d 601, 604 (MnApp 1986).

> This is an example of the Plaintiff's concern for the totality of the upbringing of his children. However, this Court's determination of custody must be made on a racially neutral basis as far as concerning itself with the effects of any potential discrimination. (emphasis added).

[¶ 16] Also in finding number 27 of the findings of fact and conclusions of law prepared by Kevin's counsel, the trial court deleted the portion that stated that the children would be subject to discrimination if they were raised away from Penrhos Farms and handwrote that "[c]ustody determinations are to be made on a racially neutral basis." (emphasis added).

[¶ 17] While the trial court was not blind to the racial backgrounds of the children, we are satisfied that it did not impermissibly award custody on the basis of race. As noted, Kevin showed a sensitivity to the need for his children to be exposed to their ethnic heritage. All of us form our own personal identities, based in part, on our religious, racial and cultural backgrounds. To say, as Dawn argues, that a court should never consider whether a parent is willing and able to expose to and educate children on their heritage, is to say that society is not interested in whether children ever learn who they are. *Palmore* does not require this, nor do the constitutions of the United States or the State of South Dakota. We hold that it is proper for a trial court, when determining the best interests of a child in the context of a custody dispute between parents, to consider the matter of race as it relates to a child's ethnic heritage and which

parent is more prepared to expose the child to it.[4]

[¶ 18] Furthermore, we refuse to second guess, as Dawn argues, the trial court's mental processes. The trial court said it decided custody on a racially neutral basis and we accept its statements as the record does not clearly impel us to do otherwise.

[¶ 19] In summary, the trial court's decision is not clearly against the laws of this country or state. There was no abuse of discretion.

### III.

 [¶ 20] The trial court awarded Dawn $445.00 per month for two years as rehabilitative alimony.[5] This $445.00 per month award was based on tuition costs but not upon living expenses.

 [¶ 21] All alimony awards are reviewed under an abuse of discretion standard. *Osman v. Keating–Osman*, 521 N.W.2d 655, 660 (S.D.1994), (citing *Vander Pol v. Vander Pol*, 484 N.W.2d 522, 524 (S.D.1992)). The amount and length of alimony is within the sound discretion of the trial court. *Schwab v. Schwab*, 505 N.W.2d 752, 754 (S.D.1993). The factors to be considered in awarding ordinary alimony are: "the length of the marriage; the respective earning capacity of the parties; their respective financial condition after the property division; their respective age, health and physical condition; their station in life or social standing; and the relative fault in the termination of the marriage." *Id.* Additional factors that must be considered when awarding rehabilitative alimony are the requesting party's foregone educational and employment opportunities during the marriage, the length of absence from the job market, and the skills and time necessary to become self-sufficient. *Johnson*, 471 N.W.2d at 163.

[¶ 22] The findings of fact and conclusions of law indicate that the trial court considered all relevant factors before determining the amount and duration of alimony. Based upon the length of the marriage and the earning capacity of both parties,[6] we can not say that the trial court abused its discretion in refusing to award living expenses as rehabilitative alimony.

[¶ 23] We have considered the remaining issue Dawn raised and conclude that it is without merit. We affirm.

[¶ 24] MILLER, C.J., and AMUNDSON, J., concur.

[¶ 25] SABERS and KONENKAMP, JJ., dissent.

[¶ 26] JOHNS, Circuit Judge, for GILBERTSON, J., disqualified.

SABERS, Justice (dissenting).

[¶ 27] It was an abuse of discretion to award the physical custody of these children to the father. The father simply is not ready to take the responsibility necessary to raise three children of the tender years of 2, 4 and 6. This is especially so when one considers the fact that, at age 30, the father is just beginning to take responsibility for himself.

[¶ 28] The key findings of the psychologist, Dr. Price, were that:

4. Kevin shows "rebelliousness or kind of a tendency to feel angry inside. A tendency of being concerned about meeting [his] own needs, that type of thing;"

---

4. In *Palmore*, 466 U.S. at 432, 104 S.Ct. at 1881–1882, 80 L.Ed.2d at 425, the Court said that "[a] core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race. Classifying persons according to their race is more likely to reflect racial prejudice than legitimate public concerns; the race, not the person dictates the category." (citations omitted). Under our holding, the person is the central focus of the analysis and not their race. There is simply no governmentally imposed discrimination based on race.

5. Rehabilitative alimony is designed to enable a spouse to refresh or enhance job skills so as to become self-sufficient and to also provide financial support while the party is obtaining the necessary training. *Johnson v. Johnson*, 471 N.W.2d 156, 163 (S.D.1991) (citing *Baltzer v. Baltzer*, 422 N.W.2d 584 (S.D.1988)); *Hautala v. Hautala*, 417 N.W.2d 879 (S.D.1988).

6. Considering Kevin's monthly net income of $1880, requiring him to pay nearly $800.00 per month would likely cause both him and the children great financial strain.

5. Kevin has a proclivity toward physical abuse;

6. Kevin is in the early stages of recovery from a chemical-dependency problem[.]

Although Father's [parental quotient] score shows a good *potential* for parenting, the children need parenting *now,* not only in the future. Therefore, I disagree with the majority's reliance on the trial court's statement that "while Dawn may well be the preferable custodial parent at the immediate time, he was of the opinion that Kevin was the preferable parent over the 'long haul.'"

[¶ 29] I think the trial court also erred by placing too much emphasis "upon the stability and continuity that Kevin could provide through his relationship with the Jones family." These children don't need to live on the farm to benefit from the "family support systems of the large and close Jones family." I submit that this family support would be there at all times, even if the children lived in Sisseton with their mother.

[¶ 30] Therefore, the mother is the best custodian to nurture the children's temporal, moral and mental welfare at this time and for the foreseeable future. SDCL 25–4–45.

[¶ 31] KONENKAMP, J., joins this dissent.