1996 SD 101

**Patricia Jane Speier BILLION,
Plaintiff and Appellee,**

v.

**Michael Mitchell BILLION, Defendant
and Appellant.**

No. 19290.

Supreme Court of South Dakota.

Argued March 11, 1996.

Decided Aug. 14, 1996.

Rehearing Denied Sept. 19, 1996.

Richard A. Johnson of Strange, Farrell, Johnson & Casey, Sioux Falls, for plaintiff and appellee.

Douglas E. Hoffman of Gibbs, Feyder, Myers, Peters & Hoffman, Sioux Falls, for defendant and appellant.

JOHNS, Circuit Judge.

[¶ 1] Michael Mitchell Billion (Michael) appeals from a judgment and decree of divorce granted to Patricia Jane Speier Billion (Patricia), challenging the division of property, the award of alimony to Patricia, the amount of the child support award to Patricia, and the denial of his request for attorney fees. We affirm in part, and reverse in part.

## FACTS

[¶ 2] Michael and Patricia were married on May 12, 1979 in Sioux Falls, South Dakota.

The parties have two children, Mark, born January 7, 1981, and Jeff, born August 2, 1983.

[¶ 3] At the time of the marriage, Patricia was employed part-time at Western Bank while working toward her undergraduate degree. After leaving Western Bank, Patricia became employed in a clerical position with B. Dalton for a short period of time. She obtained her undergraduate degree in 1982, then her Masters Degree of Education in guidance and counselling in 1988. From 1988 to 1991, Patricia worked as a contract counselor at Lutheran Social Services. From 1991 to the present, she has worked as a counselor at Mental Health Associates of Sioux Falls, South Dakota, for approximately four to eight hours per week. Her earning capacity is $30,000 a year.

[¶ 4] Michael held both a Juris Doctorate degree and a Masters of Business Administration degree at the time of the marriage, and was a certified public accountant and partner in Henry Scholten and Company, an accounting firm in Sioux Falls. In 1990, Michael left Henry Scholten and Company, selling his interest in the partnership to the remaining partners. He then became employed as an attorney with the law firm of Woods, Fuller, Schultz & Smith of Sioux Falls, where he continues to be employed. His annual salary is $85,000.

[¶ 5] The trial court divided the assets of the parties into "marital" and "non-marital." The value of the "marital" assets totaled $676,017, which figure is the difference between the appraised valuations and the liabilities thereon. Of this, $340,283 was awarded to Patricia and $335,734 was awarded to Michael. Patricia was allowed a credit of $7,400 on the amount awarded to her which represents the difference in values of the "marital" assets initially contributed by both parties. This credit resulted in the trial court's net division of the "marital assets" of $332,883 to Patricia and $335,734 to Michael.

[¶ 6] The "non-marital" assets were all found to be Patricia's sole property and are three in number. The first is the Patricia Speier Trust, of which Patricia is both the grantor and beneficiary and which is fully revocable by her. It is comprised of cash, life insurance, stocks, bonds, notes and real estate with a total value of $390,047. The various individual items found in this trust were all given to Patricia by her parents, either before or during her marriage to Michael, and either represent the value as given or their appreciated value. The second asset is the Sequoia Funds investment with a value of $172,185. This asset was purchased by Patricia with proceeds from her trust. The third asset is Patricia's fractional interest in her paternal grandmother's trust, the Irma Speier Trust. The trial court did not value this asset.

[¶ 7] The trial court granted Patricia a divorce based on irreconcilable differences. It awarded Patricia and Michael joint legal custody of Mark and Jeff; primary physical custody was awarded to Patricia, subject to Michael's reasonable visitation rights. The trial court awarded Patricia child support of $1,237 per month and $600 per month in rehabilitative alimony for a period of one year. The parties' mutual requests for attorney fees were denied.

[¶ 8] Michael appeals on the following issues:

[¶ 9] **I. Whether the trial court erred in finding that certain properties were treated by the parties as belonging solely to Patricia and whether the trial court's action in setting aside this property for Patricia was an abuse of discretion?**

[¶ 10] **II. Whether the trial court's award of alimony to Patricia was an abuse of discretion?**

[¶ 11] **III. Whether the trial court abused its discretion in calculating child support by mathematical extrapolation over and above the maximum guidelines set forth at SDCL § 25–7–6.2?**

[¶ 12] **IV. Whether the trial court abused its discretion in failing to award Michael his attorney fees?**

## STANDARD OF REVIEW

[¶ 13] We first note our standards of review for the issues presented in this case. It is settled law that we review a trial court's

findings of fact under the clearly erroneous standard. *Parsons v. Parsons*, 490 N.W.2d 733, 736 (S.D.1992) (*Parsons II*). Under this standard, we will not overturn the trial court's findings unless we are left with a definite and firm conviction that a mistake has been made. *Id.* (citing *Hilbrands v. Hilbrands*, 429 N.W.2d 750 (S.D.1988)).

■■■ [¶ 14] This Court will not disturb a trial court's division of property, the award or denial of alimony, the award of child support or the award or denial of attorney fees unless it clearly appears from the record that it abused its discretion. *Vander Pol v. Vander Pol*, 484 N.W.2d 522 (S.D.1992); *Kanta v. Kanta*, 479 N.W.2d 505 (S.D.1991); *Johnson v. Johnson*, 471 N.W.2d 156 (S.D.1991); *Fox v. Fox*, 467 N.W.2d 762 (S.D.1991); *Nelson v. Nelson*, 454 N.W.2d 533 (S.D.1990). "The term 'abuse of discretion' refers to a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence." *Kanta*, 479 N.W.2d at 507, (quoting *Gross v. Gross*, 355 N.W.2d 4, 7 (S.D. 1984)). In our review, we do not determine whether we would have made an original like ruling, but whether a judicial mind, in view of the law and circumstances of the particular

case, could reasonably have reached such a conclusion. *Nelson, supra.*

## ANALYSIS

### [¶ 15] I. Property Division

■■ [¶ 16] "Marriage is a personal relation arising out of a civil contract. . . ." SDCL 25–1–1. When a man and a woman marry, they "contract toward each other obligations of mutual respect, fidelity, and support." SDCL 25–2–1.[1] Other than for the duty of support, a spouse does not have any vested rights in the property of his or her mate during the course of their marriage.[2] This means that spouses are entitled to maintain their property separate and apart and are entitled to do with it as they see fit.[3]

■■ [¶ 17] The right to own and use one's separate property is subject to the spouse's right of support. This right is inalienable except to the extent it is modified or waived in an agreement which is entered into subsequent to marriage and in contemplation of separation or divorce. *Connolly v. Connolly*, 270 N.W.2d 44 (S.D.1978); SDCL 25–2–13.[4] However, even though parties can

1. The duty to support one's spouse is addressed in more detail in SDCL 25–7–1 through SDCL 25–7–5.

2. SDCL 25–2–4 provides: "Neither husband nor wife has any interest in the property of the other, excepting their respective rights for support as specifically provided by law, and except that neither can be excluded from the other's dwelling."
   SDCL 25–7–1 provides: "A person shall support himself or herself and his or her spouse out of his or her property or by his or her labor."
   SDCL 25–7–5 provides: "A person shall support his or her spouse, when the spouse has not deserted him or her, out of his or her separate property, when the spouse has no separate property and the spouse is unable from infirmity to support himself or herself."

3. SDCL 25–2–6 provides: "The separate property of a spouse is not liable for the debts of the other spouse contracted before or after the marriage."
   SDCL 25–2–7 provides: "Each spouse shall have and retain after marriage all the civil and property rights of a single person. Each may buy and sell, receive and convey, or dispose of by will, or otherwise dispose of any real or personal property belonging to him or her or

in which he or she may have an interest, without joining the name of the spouse except for the homestead."
   SDCL 25–2–8 provides: "A person may without the consent of his or her spouse convey his or her separate property."
   SDCL 25–2–10 provides: "Either husband or wife may enter into any engagement or transaction with the other, or with any other person, respecting property, which either might, if unmarried, subject, in transactions between themselves, to the general rules which control the actions of persons occupying confidential relations with each other, as prescribed by law."
   SDCL 25–2–12 provides: "The earnings of a spouse are not liable for the debts of the other spouse. The earnings and accumulations of a spouse and of his or her minor children living with him or her or in his or her custody while he or she is living separate from the other spouse are his or her separate property."

4. SDCL 25–2–13 provides, in part, that: "A husband and wife cannot by any contract with each other alter their legal relations, except as to property, and except that they may agree in writing to an immediate separation and may make provision for the support of either of them and of their children during such separa-

enter into support agreements post-marriage and in contemplation of separation or divorce, these agreements are always subject to rejection by a court, and, if approved, to later modification. *Connolly, supra.*

[¶ 18] The concept that one's individual property is subject to his or her spouse's right of support, is carried over in South Dakota's statute which provides for an equitable division of the parties' property upon a divorce. SDCL 25–4–44. SDCL 25–4–44 provides:

> When a divorce is granted, the courts may make an equitable division of property belonging to either or both, whether the title to such property is in the name of the husband or the wife. In making such division of the property, the court shall have regard for equity and the circumstances of the parties.

The second sentence of this statute clearly states that a court must consider both equity and the circumstances of the parties when it makes a property division. Interestingly, the "circumstances of the parties" language also appears in the statute which allows for alimony following a divorce. SDCL 25–4–41 provides:

> Where a divorce is granted, the court may compel one party to make such suitable allowance to the other party for support during the life of that other party or for a shorter period, as the court may deem just, having regard to the circumstances of the parties represented; and the court may from time to time modify its orders in these respects.

It must also be noted that several of the factors traditionally considered for the purpose of a property division are the same factors to be considered when there is a request for post-divorce alimony. Those common factors are: the length of marriage; the age and health of the parties; and the competency of each to earn a living. The age, health and competency of a individual to earn a living are all very important factors one must consider when a spouse claims that he or she is unable to support himself or herself through his or her labors. There is a symbiotic relationship between SDCL 25–4–44 and SDCL 25–4–41. If a court determines that one spouse does not have the ability to support himself or herself through his or her labors and does not have sufficient assets of his or her own and is, therefore, in need of support, then a court might award him or her assets he or she would otherwise not be entitled to. If the court awards a spouse in need of support more assets than what he or she would otherwise be entitled to and/or awards him or her certain income producing assets, then the need for post-divorce alimony can be reduced or obviated.[5] Because of this symbiotic relationship, this court always reviews property divisions and post-divorce alimony awards in conjunction with each other. *Heckenlaible v. Heckenlaible,* 1996 SD 32, ¶ 20, 545 N.W.2d 481, 485.

[¶ 19] Michael contends that SDCL 25–44–4 requires a trial court to place all of the property of the parties into one pot labeled "marital property" and, thereafter, divide it equitably. He further contends that because the trial court set aside three assets

tion...." The Court in *Connolly, supra,* cited this statute when it held that those portions of premarital agreements (now found in SDCL 25–2–16 *et. seq.*) which restrict the right to spousal support (alimony) are contrary to public policy and are, therefore, unenforceable.

5. In *Endres v. Endres,* 532 N.W.2d 65, 68 (S.D. 1995), we said:
> SDCL 25–4–44 authorizes the court to "make an equitable division of the property belonging to either or both, whether the title to such property is in the name of the husband or wife." South Dakota is considered an "all property state," in that "all property of either or both divorcing parties is subject to equitable division by the court, regardless

of title or origin." *Radigan v. Radigan,* 465 N.W.2d 483, 486 (S.D.1991).
While the State of Illinois has a different statutory property division framework, we find that the analysis of its Supreme Court in the case of *Kujawinski v. Kujawinski,* 71 Ill.2d 563, 17 Ill.Dec. 801, 807, 376 N.E.2d 1382, 1388 (1978) applies to SDCL 25–4–44. It said:
> [B]y giving both spouses a [potential interest in the property of the other] upon dissolution of marriage, the legislature sought to award economic credit for indirect or domestic contributions to the accumulation of property and sought to replace the concept of post-marital support through alimony with one of post-marital stability through a just distribution of ... [the] property [of the parties]....

for Patricia, it erred as a matter of law and, thus, abused its discretion.

[¶ 20] We disagree with Michael's "one pot" interpretation of SDCL 25-44-4 and, further, are of the opinion that his argument elevates form over substance. Just recently in *Heckenlaible*, 1996 SD at ¶ 8, 545 N.W.2d at 483, we stated that a "trial court has broad discretion in determining whether property is marital in nature and subject to division." More specifically as to various types of property, we said in *Voelker v. Voelker* that "[t]he decision whether to include *inherited property* as part of the marital property to be divided is within the discretion of the trial court." 520 N.W.2d 903, 907 (S.D.1994) (citing *Laird v. Laird*, 322 N.W.2d 254, 256 (S.D.1982)) (emphasis added). Again, in *Garnos v. Garnos*, we "noted that with respect to *inherited property* it is not ipso facto excluded from consideration in the overall division of property, but rather it is in the trial court's discretion whether [it] ... should be excluded in making that determination." 376 N.W.2d 571, 573 (S.D.1985) (citing *Balvin v. Balvin*, 301 N.W.2d 678 (S.D. 1981); *Buseman v. Buseman*, 299 N.W.2d 807 (S.D.1980); *Laird, supra.*) (emphasis added). And, finally, in *Strickland v. Strickland*, we said: "[t]his Court has consistently held that the trial court has discretion in determining how to consider *premarital assets and gifts during a marriage;* [whether to include or exclude them from the marital estate]." 470 N.W.2d 832, 836 (S.D.1991) (citing *Lien v. Lien*, 278 N.W.2d 436 (S.D. 1979)) (emphasis added).

[¶ 21] Under the language of our statute and the caselaw, it is not important whether the court creates "marital" and "non-marital" estate pots or whether it places all of the property of the parties, whether individually or jointly held, in one pot. What is important is that the court, before it sets aside certain properties as "non-marital," consider the seven principal factors we have repeatedly held must be considered in making an equitable property division. *Voelker*, 520 N.W.2d at 907. The factors are: (1) the duration of the marriage; (2) the value of the property owned by the parties; (3) the ages of the parties; (4) the health of the parties; (5) the competency of the parties to earn a living; (6) the contribution of each party to the accumulation of the property; and (7) the income-producing capacity of the parties' assets. *Id.* at 907–8 (citations omitted). Only in the case where one spouse has made no or de minimis contributions to the acquisition or maintenance of an item of property and has no need for support, should a court set it aside as "non-marital" property.

[¶ 22] In finding of fact # 8, the trial court found that "[e]ach party brought into the marriage various premarital assets." In finding of fact # 9, the trial court found:

During the course of the marriage, plaintiff received additional gifts from her family that were placed in trust. The Court finds that it was the intent that these gifts were not to be treated as marital property and, in fact, were not treated as marital property. This property was separate and maintained that way.

[¶ 23] Michael contends that the trial court erred in its finding of fact # 9 that the parties treated the Patricia Billion Trust and the Sequoia Funds investment as Patricia's sole property. Instead, Michael argues that the evidence shows that he substantially contributed to both of the assets in the way of money and services, thus converting the assets to "marital" assets.

[¶ 24] Based on our review of the record, we are satisfied that the trial court's finding is not clearly erroneous for the following reasons. First, it is true that the trial court found that certain monies from the separate sales of a residence and shares of stock were placed in the Patricia Billion Trust and the Sequoia Funds investment, respectively. The trial court, however, gave these facts due consideration when it excluded these sums from the respective assets and placed them in the "marital" property pot for division.

[¶ 25] Second, the assets were given only to Patricia by her family. There is no question that they were ever given jointly to Patricia and Michael.

[¶ 26] Third, albeit he did review quarterly reports, Michael never exercised any control

over any of the assets found in either of the trusts or in the Sequoia Funds. Historically, the investment decisions were made by the bank and by Patricia's father, who held a power of attorney to treat the real estate in Patricia's trust as he saw fit.

[¶ 27] Fourth, by the terms of her trust and her Last Will and Testament, Patricia made it clear that she would dispose of her property as she saw fit. Her initial trust instrument entered in 1972 (prior to her marriage to Michael) provided that her estate would go to her children, but if she did not have any survive her, then to her sisters. In 1981, after her marriage to Michael, she made amendments to her trust but she continued to provide that her estate would go to her children; if they did not survive her, it would then go to her sisters. It was not until 1991 that Patricia executed a will leaving the home and its furnishings, as well as the motor vehicles, to Michael. The will provides for the rest of her estate to go to her trust under which the balance of her estate will go to her children; only if they do not survive her, would it then go to Michael.

[¶ 28] Fifth and finally, Michael's perception of his and Patricia's respective rights in the assets acquired by Patricia from her family, is reflected in a waiver that he executed on the same day and month in 1981 that Patricia executed her first amendment to her trust. This waiver provided:

> I, Michael Billion, the lawful spouse of Patricia Jane Speier Billion, after full and fair disclosure of the value of the property and the estate of my spouse and the nature of my rights in these assets, do hereby waive all right, title, interest, equity and estate which I may now or in the future have in or to the property or estate of the above named spouse, particularly as to the elective share provisions under SDCL 30–5A.

By executing this waiver, Michael acknowledged that Patricia's property was hers to do with as she saw fit and that, further, he would not be entitled to any of her assets if she predeceased him, since his children would then be entitled to all of said property as beneficiaries of Patricia's trust.

[¶ 29] We hold that the trial court did not err in finding that the parties treated Patricia's trust and the Sequoia Funds as her separate property. We also hold that the trial court did not abuse its discretion in setting aside these two assets and the Irma Speier Trust for Patricia as Michael made only de minimus contributions to them and he has made no showing of a need for support from Patricia.

[¶ 30] The remaining question is whether the trial court abused its discretion when it divided the "marital" assets. Michael's argument essentially is that since he contributed $1,447,239 in earned income to the marriage from 1979 through 1993, and since Patricia's earned income was $40,416 during that time, he should have received more than 50 percent. Patricia, however, contributed more than her earnings to this marriage. Over the course of the marriage she withdrew the sum of $398,019 from her trust and Sequoia Funds which was used for family acquisitions and expenses. She also performed the duties of a mother and homemaker, which duties we have consistently held "constitute a valuable contribution to the marital property." *Johnson*, 471 N.W.2d at 160.

[¶ 31] Considering the seven factors mentioned above, we hold that the trial court did not abuse its discretion in its distribution of the "marital property." Our considerations include the fact that we are dealing with a sixteen year marriage, that Michael is in his late 40's and Patricia is in her early 40's, that both parties enjoy relatively good physical and mental health conditions, that Michael's established ability to earn a living is far greater than Patricia's and that it most likely will continue to be, and that Michael received $277,855 in investment accounts and various liquid assets in comparison to the sum of $117,733 received by Patricia.

[¶ 32] We affirm the trial court on its division of *all* of the parties' property.

### [¶ 33] II. Alimony

[¶ 34] Michael contends that the trial court's finding that Patricia was in need of financial assistance to meet her present liv-

ing expenses was clearly erroneous and, for that reason, it abused its discretion in awarding her $600 per month for one year for rehabilitative alimony.

The factors to be considered in awarding ordinary alimony are: "the length of the marriage; the respective earning capacity of the parties; their respective financial condition after the property division; their respective age, health and physical condition; their station in life or social standing; and the relative fault in the termination of the marriage." Additional factors that must be considered when awarding rehabilitative alimony are the requesting party's foregone educational and employment opportunities during the marriage; the length of absence from the job market; and the skills and time necessary to become self-sufficient.

*Jones v. Jones,* 1996 SD 2, ¶ 21, 542 N.W.2d 119, 124 (citations omitted).

[¶ 35] The trial court based its award of rehabilitative alimony of $600 a month for a period of one year on the rationale that it would take a year for Patricia to reach her earning capacity of $30,000 per annum and that in the interim she would be experiencing a shortfall in her income [6] over her expenses. While the court and counsel characterized the alimony as rehabilitative alimony, we are of the opinion that the award does not so qualify in this case. The purpose of rehabilitative alimony is "to permit a spouse the means necessary to enable him or her to refresh or enhance job skills necessary to become self-sufficient, and provide financial support while the party is obtaining necessary training." *Johnson,* 471 N.W.2d at 163, (citing *Baltzer v. Baltzer,* 422 N.W.2d 584 (S.D.1988); *Hautala v. Hautala,* 417 N.W.2d 879 (S.D.1988)). *See also Parsons II.* In this case Patricia has all of the training and skills necessary to practice her chosen profession. However, "although we urge the use of careful and consistent language, the issue is not the name placed on the

alimony, but whether the record supports the award." *Hautala,* 417 N.W.2d at 882. Hence, we analyze Patricia's request and the court's award as one for ordinary alimony.

[¶ 36] The trial court did not find and we are unable to glean from the record that Patricia will no longer have the benefit of her marital right of support because of any fault on the part of Michael. In fact, Michael did not want this divorce and, at first, denied that any ground for divorce existed. Thus, we do not find any equitable reason for the support award.

[¶ 37] The trial court grounded its award on Patricia's *need* for financial assistance for the one year period. While the trial court considered the actual income derived from all of the assets awarded to Patricia, both "marital" and "non-marital," it apparently did not consider the value of the "non-marital" assets in arriving at its conclusion that Patricia had such a need. When we consider the value of Patricia's "non-marital" assets (not even knowing the value of Patricia's interest in the Irma Speier Trust) in connection with the value of her "marital" assets and the other income found by the trial court, we are left with the definite impression that Patricia has no need for financial assistance, but rather, has the financial wherewithal to live comfortably within the lifestyle she claims. We therefore conclude that the trial court clearly erred in finding that Patricia is in need of temporary support from Michael and we further conclude that, when all of the ordinary alimony factors are considered, it abused its discretion in awarding her any amount of alimony. We reverse on this issue.

## [¶ 38] III. Child Support Calculation

[¶ 39] The combined net monthly income of Michael and Patricia exceeds the maximum income provided for in the child support guidelines of SDCL 25–7–6.2.

Recognizing this fact, the trial court set a combined child support obligation of $1,883

---

6. Patricia's income consisted of child support, earnings from her practice, and investment income from both "marital" and "non-marital" assets. The trial court, for the purpose of the child support calculation, found Patricia's projected investment and dividend income to be

$10,000 per annum. While Michael quarrels with the $10,000 figure, the difference between what he claims the amount to be and what the trial court found, are not materially significant for purposes of either child support or alimony considerations.

per month by mathematically extrapolating from the guidelines.[7] The trial court compared the incomes of Michael and Patricia and then found that Michael was responsible for 65.7 percent of the support obligation, which resulted in a monthly support obligation of $1,237.

[¶ 40] The trial court based its actions on the provisions of SDCL 25–7–6.9. SDCL 25–7–6.9 provides:

For a combined net income above the schedule in § 25–7–6.2, the child support obligation shall be established at an appropriate level, taking into account the actual needs and standard of living of the child.

In *Bloom v. Bloom*, 498 N.W.2d 213 (S.D. 1993), we analyzed this statute and the previous cases interpreting it. *Earley v. Earley*, 484 N.W.2d 125 (S.D.1992), *cert. denied*, 506 U.S. 895, 113 S.Ct. 272, 121 L.Ed.2d 200 (1992) and *Jones v. Jones*, 472 N.W.2d 782 (S.D.1991). There we said that *Earley* establishes:

the rule that for parties with a combined net monthly income above the amount contemplated in the child support schedules, the trial court *may* calculate support by mathematical extrapolation, but it is not obligated to do so. Rather, the essential inquiry remains the actual needs and standard of living of the children.

*Bloom*, 498 N.W.2d at 217 (emphasis in original). Furthermore, in *Ochs v. Nelson*, 538 N.W.2d 527, 530 (S.D.1995), we just recently said:

In *Jones*, this Court stated that a party requesting an upward adjustment above the guidelines has the burden of proving the child's needs and standard of living. 472 N.W.2d at 785. There, an upward adjustment was proper because the children's needs were not being met.

\* \* \* \* \* \*

Yet a child's necessities are not the only consideration. "[T]he essential inquiry remains the actual needs *and* standard of

living of the children." *Bloom*, 498 N.W.2d at 217. (emphasis added).

[¶ 41] Patricia offered evidence at trial that her monthly cost of living for herself and the two boys was $5,100. Michael points out that the $5,100 does not include a mortgage expense but does include such expenses as a personal trainer for Jeff and average monthly expenses of $1,600 for keeping Patricia's and Mark's show horses. Michael contends that the trial court abused its discretion in setting a monthly joint child support obligation in the amount of $1,883 because this amount requires him to provide for luxuries and extravagances and that it is not related to the reasonable needs of his children. He argues, citing SDCL 25–7–6.1, that child support encompasses only necessary support. SDCL 25–7–6.1 provides, in part, that "[t]he parents of a child are jointly and severally obligated for the necessary maintenance, education and support of the child in accordance with their respective means." Obviously, the word "necessary," as used in § 25–7–6.1, is a relative term in that it is modified by the words "in accordance with [the parents'] ... respective means." Thus the term "necessary" will mean something different in each individual case depending on the incomes of the parents. This concept is carried through in § 25–7–6.2 in that the amount of necessary support for one or more children increases with each incremental increase in the incomes of the parents. Finally, this same concept is carried through in § 25–7–6.9. While the statute speaks in terms of a child's standard of living, "[o]bviously, in divorce cases a child's standard of living reflects the parent's standard of living before they separated. Standard of living remains an important factor after a divorce." *Ochs*, 538 N.W.2d at 531.

[¶ 42] In *Ochs* we asked and answered the question,

[i]f children must endure their parents' poverty, should they not also share their affluence? We have previously recognized

7. The trial court arrived at a multiplier of 24.6 percent by ascertaining the mathematical relationship between the maximum combined monthly net income under the guidelines of $4,000 and the support obligation of $987 pro-

vided in the guidelines for two children at the $4,000 level. The trial court then multiplied 24.6 percent times the combined net income of the parties.

a child's interest in a parent's well-to-do standard of living. In *Saint–Pierre v. Saint–Pierre*, 357 N.W.2d 250, 259 (S.D. 1984), the mother had "a demonstrated ability to earn a substantial income from her medical practice." Although the *Saint–Pierre* children were young, they were permitted to continue in a standard of living their mother's income provided in the past when the parents lived together. *Id.* (citing *Wallahan v. Wallahan*, 284 N.W.2d 21 (S.D.1979)).

*Id.*

[¶ 43] The trial found that Michael's children were raised in a very comfortable lifestyle which would call for monthly expenditures in excess of the amount set forth in the guidelines. The trial court then concluded that the actual needs and lifestyles of the children warranted a support amount of $1,883 ($941.50 per child) per month. Michael does not claim that the finding of fact is clearly erroneous. Rather, when his arguments are distilled, he complains that he should not have to maintain the lifestyle enjoyed by his children prior to the divorce when they are not in his physical custody. His concern is that while his children will receive a benefit from his payment, his ex-spouse will also receive a benefit since she shares the lifestyle enjoyed by the children.

[¶ 44] Although Patricia will undoubtedly derive an indirect benefit from the fact that Michael will be paying $1,237 per month in child support payments, there is nothing this Court or any other court can do about that. Anytime anyone receives financial assistance, he or she will receive a benefit. The indirect financial benefit a custodial spouse receives cannot serve as a justification for denial of support to children whose actual needs and standard of living warrant a particular award.

[¶ 45] Based on our review of the record, we are satisfied that Michael is not paying an unfair proportion of his children's support needs when those needs are considered in connection with the standard of living they have previously enjoyed. The decision of the trial court was within the scope of the evidence and, therefore, we conclude that the trial court did not abuse its discretion. We affirm the trial court on this issue.

[¶ 46] **IV.  Attorney Fees and Costs**

[¶ 47] Michael contends that the trial court abused its discretion in failing to award him attorney fees when, even though he did not seek the divorce, he was forced to expend monies in the defense of his legitimate interests. Whether one seeks a divorce is not a factor a court considers when it is presented with a request for attorney fees.

[¶ 48] Attorney fees in domestic relations cases are provided for by SDCL 15–17–38. It provides, in pertinent part:

> The court, if appropriate, in the interests of justice, may award payment of attorney's fees in all cases of divorce, ... support or alimony. The court may award the fees before or after judgment or order.

[¶ 49] This statute and its predecessor, SDCL 15–17–7,[8] require a two-step analysis:

> First, the court must determine what constitutes a reasonable attorney fee. This requires consideration of (1) the amount and value of the property involved, (2) the intricacy and importance of the litigation, (3) the labor and time involved, (4) the skill required to draw the pleadings and try the case, (5) the discovery utilized, (6) whether there were complicated legal problems, (7) the time required for the trial, and (8) whether briefs were required. Second, it must determine the necessity for such fee. That is, what portion of that fee, if any, should be allowed as costs to be paid by the opposing party. This requires consideration of the parties' relative worth, income, liquidity, and whether either party

---

**8.**  SDCL 15–17–7 provided:

> The court may allow attorneys' fees as costs for or against any party to an action only in the cases if it is specifically provided for by statute, but nothing herein abridges the power of the court to order payment of attorney's fees in all cases of divorce, annulment of marriage, determination of paternity or for separate maintenance and alimony, if the allowance of the same before or after judgment is warranted.

unreasonably increased the time spent on the case.

*Fox,* 467 N.W.2d at 768. (citations omitted).

■ [¶ 50] Finding that each party had more than sufficient assets and income to pay their respective attorney fees and finding that neither party had "brought this matter to court on an issue that could be termed frivolous or not without support"[9] the trial court concluded that each party was to pay their own attorney fees. The record reflects that the trial court considered the relevant factors in its determination denying attorney fees. We hold that the trial court has not abused its discretion and, thus, affirm on this issue.

## CONCLUSION

[¶ 51] We reverse the trial court's award of alimony and affirm the property division, the child support award and the denial of Michael's request for attorney fees. Further, both parties have filed verified motions for appellate attorney fees; which motions we deny after consideration of the two-step analysis mentioned previously.

[¶ 52] MILLER, C.J., and KONENKAMP, J., concur.

[¶ 53] SABERS, J., specially concurs in part and dissents in part.

[¶ 54] GILBERTSON, J., concurs in part and dissents in part.

[¶ 55] JOHNS, C.J., for AMUNDSON, J., disqualified.

SABERS, Justice (specially concurring in part and dissenting in part).

[¶ 56] I would reverse and remand on issue 1, property distribution, because the wife is not entitled to one-half of the marital property when she already has nonmarital property of at least $562,000. Under these circumstances, she should receive no more than forty percent of the marital property, which would be approximately $270,000. This would still leave her with a total of approximately $832,000 compared to husband at $405,000.

[¶ 57] I would reverse and remand on issue 3, child support, to reconsider the ability of each to pay based on income and income-producing property. These calculations should *realistically* include the income from wife's nonmarital trust property of $562,000.

[¶ 58] I also join the writing of Justice GILBERTSON on all issues.

GILBERTSON, Justice (concurring in part and dissenting in part).

[¶ 59] 1. **Property Division**

[¶ 60] The trial court, in its allocation of the $1,307,998 of assets of the parties, awarded $972,246 or 74% of the assets to Patricia and $335,734 or 26% of the assets to Michael. While this appellate court has traditionally given trial judges considerable latitude in the disposition of assets, I find this allocation to be an abuse of discretion. *Voelker v. Voelker,* 520 N.W.2d 903, 907 (S.D.1994). The major factor which results in this lop-sided award is the trial court's treatment of various trust assets of approximately $562,232,[10] of which Patricia is a beneficiary, to be "nonmarital property." The error is compounded by the inclusion of Michael's major asset, the proceeds of his partnership buyout from his CPA firm, into the marital assets and dividing it in half for purposes of distribution.

[¶ 61] We have held that South Dakota is an "all property state" which results in all property of both of the divorcing parties being subject to equitable division by the trial court, regardless of title or origin. *Endres v. Endres,* 532 N.W.2d 65, 68 (S.D.1995); *Radigan v. Radigan,* 465 N.W.2d 483, 486 (S.D.1991). This is in accord with the dictates of SDCL 25-4-44 which authorizes division of assets upon a divorce "whether the

---

9. This oral finding of the trial court was incorporated by reference into the court's written findings of fact and conclusions of law.

10. Although Finding of Fact # 8 states Patricia brought $562,232 in trust assets to the marriage, that finding is in error. The evidence shows she brought $83,036 in trust assets to the marriage. The difference between $83,036 and $562,232 accounts for the gain realized to the trust assets during the course of the marriage, after withdrawals of some $337,570 during that period.

title to such property is in the name of the husband or the wife." "The statute [SDCL 25-4-44] is specific that title does not control the distribution of the property in a divorce action." *Clement v. Clement,* 292 N.W.2d 799, 801 (S.D.1980).

[¶ 62] The factors to be included for determining property division are: (1) duration of the marriage; (2) value of property owned by the parties; (3) ages of the parties; (4) health of the parties; (5) competency of the parties to earn a living; (6) contribution of each party to the accumulation of property; and (7) income-producing capacity of the property owned by the parties. *Clement,* 292 N.W.2d at 801. Rather than applying the above factors and our prior case law, the trial court made its determination that Patricia's trust assets were nonmarital property based solely on the intent of her father and grandmother. It held in its bench decision, incorporated into the Findings of Fact:

> There were assets which the court finds were gifts to Patricia Billion, that were not intended to go to Michael Billion from Patricia Billion's family. It appears clear that her family made gifts to her which THEY INTENDED TO BE TO HER ONLY, and that's very clear through the testimony that at least Miss Billion's father did not see these assets as being commingled, but saw them going to his daughter. (emphasis added)

Likewise, Finding of Fact # 9 states in part, "The Court finds that it was the intent that these gifts were not to be treated as marital property and, in fact, were not treated as marital property." [11] There is no basis in our case law to set aside the above-cited seven factors and remove a substantial portion of the assets from the status of being a marital asset based solely on the intent of the grantor.[12] In fact there is substantial authority to the contrary.

[¶ 63] In *Clement,* the husband received a sizable inheritance from his father which was invested in real estate. The wife put her earnings from her job towards the payment of family expenses. We held that the wife had contributed substantially to the marital assets and an equal division of all property was appropriate including the proceeds of the husband's inheritance. 292 N.W.2d at 801.

[¶ 64] In *Prentice v. Prentice,* 322 N.W.2d 880 (S.D.1982), the husband received a gift of farm land from his father prior to the marriage. During the eight years of marriage, the wife put her earnings towards the payment of the family expenses and obligations. The trial court excluded the gift from the marital assets. We reversed, holding that it was an abuse of discretion not to include the realty as a marital asset given the contributions of the wife to it and to the family. *Id.* at 883. Essentially the same result occurred in *Garnos v. Garnos,* 376 N.W.2d 571, 573 (S.D.1985) and *Buseman v. Buseman* 299 N.W.2d 807 (S.D.1980).

[¶ 65] Most recently in *Heckenlaible v. Heckenlaible,* 1996 SD 32, 545 N.W.2d 481, the majority of this Court held realty gifted to a couple as an advancement on the husband's inheritance, a scant six months before separation and filing of divorce, to be a divisible marital asset. The duration of the marriage was 26 years. The fact that the wife made no contribution towards the acquisition or upkeep of the realty during this six-month period was not found to be a basis for excluding the realty from the marital corpus.

[¶ 66] In the case now before us, Michael worked long and hard to secure an excellent standard of living for his family. During the course of this marriage Michael earned $1,455,000 which was contributed to the support of the family. While Patricia's contribu-

---

**11.** The majority also cites to various changes in wills and trusts by Patricia to show that she intended to keep her property, just that, her property. This is of minimal relevance when analyzed under our seven criteria for determining property division in a divorce, and in light of SDCL 25-4-44.

**12.** The majority also cites to a 1981 "waiver" executed by Michael concerning Patricia's assets.

At the commencement of trial, the parties stipulated that this "waiver" did not constitute a postnuptial agreement and was not legally binding. It was introduced for the limited purpose of showing the intent of the parties at the time the document was signed. In making its property division, the trial court apparently gave the document no evidentiary weight as it did not mention the document.

tions of $337,570 from the trust to the family should not be ignored, Michael's contributions clearly allowed Patricia the option of retaining assets in the trust rather than being forced to sacrifice them to support the family and meet its financial obligations and expenditures.[13] Unlike *Bennett v. Bennett*, 516 N.W.2d 672 (S.D.1994), and *Heckenlaible, supra*, where the assets arrived at the eleventh hour of the marriage, here the assets were in the marital estate during all, or a substantial portion, of the marriage and, despite withdrawals for family use, had impressively appreciated during that time period.

[¶ 67] Those cases wherein we have allowed exclusion of gifted or inherited assets from the marital corpus have been on the basis that the nonbeneficiary spouse did nothing to contribute toward the accumulation of the property and did not further its acquisition by assuming family obligations. *See Bennett*, 516 N.W.2d 672, 677; *Voelker*, 520 N.W.2d 903, 908; and *Andera v. Andera*, 277 N.W.2d 725, 728 (S.D.1979). The facts of these cases stand in stark contrast to Michael's contribution of $1,455,000 in earnings to the family during the marriage.

[¶ 68] Although all of the above cases deal with division of realty either gifted to or inherited by the husband, the same legal principles applied therein should be applied to the facts now before us. "All property" clearly includes both real and personal property. *Bennett*, 516 N.W.2d at 677. Gender of either party is not a consideration in a property division in a divorce. *Lien v. Lien*, 278 N.W.2d 436, 438 (S.D.1979); *Orr v. Orr*, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979). The intent of the grantor or testator,

or for that matter, the intent of the beneficiary or heir who is involved in the marriage, is also not the evidentiary basis for determination of this issue. Attention to the manner of acquisition exalts form to the exclusion of the above-cited seven substantive criteria.[14] *Heckenlaible*, 1996 SD 32 at ¶ 36, 545 N.W.2d at 487 (Gilbertson, J., dissenting). *See also Saint–Pierre v. Saint–Pierre*, 357 N.W.2d 250, 258 (S.D.1984) (trial court is not bound to set aside inherited property, but may properly consider it as part of the property to be divided). In the past, we have not hesitated to reverse such inequitable, lopsided property divisions as inadequate. *Laird v. Laird*, 322 N.W.2d 254, 257 (S.D. 1982); *Johnson v. Johnson*, 471 N.W.2d 156, 161 (S.D.1991).

I would reverse and remand on issue one for an equitable division of the property in accordance with the above-cited authority.

[¶ 69] **2. Alimony Award**

In isolation, I have no dispute with the trial court's determination to award rehabilitative alimony to Patricia of $600 per month for twelve months. It will take that period of time for her to reach her earning capacity. Given the total assets of the marriage, it is a small amount. However, in fairness to both Patricia and Michael, as I would reverse the disposition of the marital assets, the trial court must also be permitted to review the alimony award in conjunction with the property division. *Kanta v. Kanta*, 479 N.W.2d 505, 511 (S.D.1991) (amount of alimony must be reconsidered in light of holding remanding property division for reconsideration); *Strickland v. Strickland*, 470 N.W.2d 832, 838 (S.D.1991). Thus, I would reverse and remand on issue two.

---

**13.** The parties strongly disagree over the extent to which Michael may have contributed funds to the trust. It is clear however that Michael did contribute funds to the trust to some extent as the trial court found, "there has been commingling within the account."

**14.** Even if one accepts this legal premise advanced by the majority, the facts still do not support its result. $390,047 of the $562,232 which the majority finds to be "non-marital" assets is contained in a trust which is under the sole control of Patricia and not her father or grandparents. It is the Patricia Speier Trust of

which Patricia is both the grantor and beneficiary and which is fully revocable by her. As noted by the majority, the remaining $172,185 is in a Sequoia Funds investment and "was purchased by Patricia with proceeds from her trust." But for her voluntary creation of this trust, these funds would have been in the marital assets along with all of those contributed by Michael. Can one anticipating an upcoming divorce now avoid division of assets merely by putting them in a revocable trust? I would respectfully but emphatically state that this should not be the law in this State.

[¶ 70] 3. **Child Support**

[¶ 71] The trial court awarded child support of $1,237 per month for two children based on extrapolation of the guidelines when applied to the parties' income.

[¶ 72] SDCL 25–7–6.1 requires child support for "necessary maintenance, education and support." The child support award must be based upon the reasonable financial needs of the children. *Brandriet v. Larsen,* 442 N.W.2d 455, 461 (S.D.1989); *Bruning v. Jeffries,* 422 N.W.2d 579 (S.D.1988). The state has an interest in protecting the welfare of its children which includes their standard of living. *Feltman v. Feltman,* 434 N.W.2d 590, 592 (S.D.1989). "[T]he essential inquiry remains the actual needs and standard of living of the children." *Bloom v. Bloom,* 498 N.W.2d 213, 217 (S.D.1993). Extrapolation beyond the maximum guidelines level is permissible, but not mandated, where the parents' joint income exceeds the guidelines' upper limit. *Ochs v. Nelson,* 538 N.W.2d 527, 530 (S.D.1995). Thus, what becomes "necessary maintenance, education and support" under SDCL 25–7–6.1 clearly varies with the facts of each case with consideration being given to the lifestyle to which the child was accustomed before the divorce.

[¶ 73] Patricia cites *Ochs* as authority for the trial court's result in this case. However *Ochs* dealt with a mother and father who had never married and lived in very different financial worlds. The mother lived on the edge of poverty while the father lived in substantial affluence. We held it appropriate to require child support above the guidelines to allow the child to live in essentially the same lifestyle whether he experienced his father's world or his mother's world. *Ochs,* 538 N.W.2d at 531.

[¶ 74] Clearly such is not the case here. The trial court granted Patricia's request and justified its extrapolation solely on the lifestyle to which the children had been accustomed during the course of the marriage. Patricia exits the marriage with no mortgage or rental payments, no car payments or any debts whatsoever. Thus none of her financial resources are reduced by such obligations and she can devote her finances to current and future living costs.

[¶ 75] Patricia sought $1550 per month or over $50 per day for food and movies. Patricia justifies this amount on the ground that she runs an open house which allows the neighbor children to eat with her children as they wish. Such hospitality may be commendable but the statute only requires Michael to support his children and not the neighborhood children as well.

[¶ 76] Patricia also requested $400 per month for a "personal trainer" for one child despite the fact there had been no such expenditure during the course of the marriage. The sizable expenditure of $1600 per month for keeping show horses is also not within the statutory definition of "necessary expenditures."

[¶ 77] Factually, this case is much closer to *Bloom,* 498 N.W.2d 213, than it is to *Ochs.* In *Bloom,* we held that designer clothes, cellos, ballet lessons and language camps were not necessities of life despite the comfortable financial situation of the noncustodial parent. *Id.* at 218.

[¶ 78] Either parent with sufficient financial means can provide such items to his or her child if they choose. Whether to provide such amenities of life to one's child should be up to the discretion of that parent. I find nothing in the guidelines or interpretative case law which requires a noncustodial parent to be forced to finance such activities via involuntary child support. *Id.*

[¶ 79] I would hold the trial court was within its discretion in its calculation of the parties' income but it abused its discretion in its extrapolation of Michael's child support based on the "needs" of the children as requested by Patricia which are clearly luxury expenditures not contemplated by our support statutes. Therefore, I would reverse and remand on issue three.

[¶ 80] 4. **Attorney's Fees**

[¶ 81] I would affirm the decision of the trial court in refusing to award attorney's fees to Michael.